# EXHIBIT A



COPY

SEP 09 2016

MICHAEL K. JEANES, CLERK
J. BAKER
DEPUTY CLERK

**RYLEY CARLOCK & APPLEWHITE**
One North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4417
Telephone 602.440.4800
Fax 602.257.9582

Rodolfo Parga, Jr. – 015515
rparga@rcalaw.com
Andrea G. Lovell – 019882
alovell@rcalaw.com

Attorneys for Plaintiff AmeriFirst Financial, Inc.

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| AMERIFIRST FINANCIAL, INC., an Arizona corporation, | Case No. CV 2016-014888 |
| Plaintiff, | **VERIFIED COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF** |
| v. | |
| PKY FUND II PHOENIX III, LLC, a Delaware limited liability company; and YOURPEOPLE, INC., a Delaware corporation d/b/a Zenefits FTW Insurance Services, | **(Commercial Court Assignment Requested)** |
| Defendants. | **(Jury Trial Demanded)** |

Plaintiff AmeriFirst Financial, Inc. ("AmeriFirst" or "Plaintiff"), by and through undersigned counsel, for its Verified Complaint against Defendants PKY Fund II Phoenix III, LLC ("Parkway") and YourPeople, Inc. d/b/a Zenefits FTW Insurance Services ("Zenefits") (collectively, "Defendants"), hereby pleads and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff AmeriFirst is an Arizona corporation doing business in Maricopa County, Arizona.

2.     Defendant Parkway is a Delaware limited liability company doing business in Maricopa County, Arizona.

3.     Defendant Zenefits is a Delaware corporation doing business in Maricopa County,

4063315.3

Arizona.

4.      Defendants caused acts or omissions to occur in Maricopa County, Arizona, upon which this Verified Complaint is based.

5.      This court has jurisdiction over the parties to and subject matter of this action, and venue is proper in Maricopa County pursuant to A.R.S. § 12-401.

## GENERAL ALLEGATIONS

6.      This is an action for injunctive relief, specific performance and for damages arising from Parkway and Zenefits conspiring and colluding with one another to deprive AmeriFirst of the benefit, as described more fully below, of a sublease agreement for certain office space, all so that Defendants could unlawfully better their respective financial positions at AmeriFirst's expense.

7.      On or about June 19, 2015, Parkway and Zenefits entered into a ten-year Commercial Lease (the "Commercial Lease"), pursuant to which Zenefits leased several floors (the second, third, seventh, eighth and ninth floors) from Parkway in a building known as the Hayden Ferry Lakeside Phase III building ("Hayden Ferry III") located at 40 E. Rio Salado Parkway, Tempe, Arizona 85281.

8.      In or about December 2015, AmeriFirst, a long-established mortgage banking company headquartered in Maricopa County, expressed to Parkway an interest in leasing space in Hayden Ferry III. AmeriFirst originates approximately $2,000,000,000 in mortgage loans each year, employs over 500 people and has approximately 35 offices. The proposed space would be for headquarters operations as well as some loan production.

9.      AmeriFirst and Parkway first discussed the possibility of AmeriFirst leasing space on the ground floor of Hayden Ferry III.

10.      When it became clear that the ground floor space was not suitable for AmeriFirst's needs, AmeriFirst and Parkway next discussed the possibility of AmeriFirst leasing space on the fourth floor of Hayden Ferry III.

11.      In connection with their discussions about the possibility of AmeriFirst leasing

space on the fourth floor of Hayden Ferry III, Parkway requested and reviewed detailed information concerning AmeriFirst's financial condition.  Parkway did not express any concerns about AmeriFirst's financial condition or about the tenant mix in Hayden Ferry III.  Instead, in or about February 2016, Parkway proposed a draft lease for AmeriFirst's consideration. AmeriFirst ultimately did not lease the space on the fourth floor of Hayden Ferry III.

12.    In or about March 2016, AmeriFirst learned that Zenefits was seeking a tenant to sublease its space on the third floor of Hayden Ferry III.  AmeriFirst and Zenefits entered into a Letter of Intent whereby AmeriFirst would sublease space on the third floor of Hayden Ferry III and Zenefits would provide to AmeriFirst certain furniture, fixtures and equipment ("FF&E"), including but not limited to mounted television monitors, video-conferencing equipment, Wi-Fi equipment and appliances.

13.    Despite the parties' Letter of Intent, in or about June 2016, Zenefits asked AmeriFirst whether it would consider subleasing space on the seventh floor of Hayden Ferry III (which would include FF&E value at approximately $300,000.00 less than the FF&E on the third floor), as opposed to the space on the third floor that the parties had been discussing. The discussions acknowledged the trade-off of the reduced FF&E on the seventh floor for the value of being on a higher floor, thus leaving the rental rate unchanged

14.    Ultimately, AmeriFirst agreed to sublease space on the seventh floor of Hayden Ferry III, and AmeriFirst and Zenefits entered into a written Sublease dated July 1, 2016 (the "Sublease").

15.    Pursuant to paragraph 38 of the Commercial Lease between Zenefits and Parkway, Zenefits was permitted to sublease its leased space in Hayden Ferry III with the written consent of Parkway, "which consent shall not be unreasonably withheld, conditioned or delayed."

16.    In late July 2016, all parties exchanged and commented on drafts of a Consent of Landlord (the "Consent"), whereby Parkway would consent to AmeriFirst's sublease from Zenefits of space on the seventh floor of Hayden Ferry III.  On or about July 28, 2016, counsel for Parkway sent an e-mail message attaching clean and redlined versions of the Consent and indicating that "[w]e just need to get permission to slip page the executed signature pages into

the clean version of the Consent attached to this email." In response, representatives of both AmeriFirst and Zenefits signed the Consent.

17.     On or about August 2, 2016, in response to Zenefits' broker, Nathan Zoucha, inquiring "when we can expect a fully executed [Consent] agreement," Parkway Vice President Matt Mooney responded that he "should be back to you guys in no more than a day or two with both signatures."

18.     At no time did Mr. Mooney or any other Parkway representative express any concerns about AmeriFirst's financial condition or the tenant mix in Hayden Ferry III.

19.     On or about August 3, 2016, AmeriFirst's broker, James Robinson, followed up with Mr. Mooney, asking "[a]ny word on approval of the floor plan?"

20.     Later on August 3, 2016, Mr. Zoucha of Zenefits inquired of AmeriFirst whether AmeriFirst would reconsider subleasing space on the third floor of Hayden Ferry III, as opposed to the seventh floor of Hayden Ferry III. Mr. Zoucha did not explain the reason for this unexpected request, and AmeriFirst ultimately indicated that it wished to proceed with the Sublease that had already been executed for the space on the seventh floor, and for which the parties were merely awaiting Parkway's expected consent.

21.     AmeriFirst incurred significant costs in architectural planning, internal planning, legal fees, foregone lease opportunities and other items in reliance upon Zenefits' execution of the Sublease and Consent, and Parkway's indication that its executed version of the Consent would be forthcoming shortly.

22.     Having still not received the executed Consent from Parkway, AmeriFirst sent a letter to Zenefits dated August 25, 2016, requesting that Zenefits take immediate action to obtain Parkway's executed Consent. AmeriFirst explained that its ability to continue with planning, permitting and construction was being materially impaired by the lack of the executed Consent, and that AmeriFirst was losing its own use of the space, as well as incurring holdover rent costs in its existing facilities.

23.     Also on August 25, 2016, AmeriFirst's broker, Mr. Robinson inquired of Mr. Mooney whether he could confirm that there was "no other deal or option being contemplated

- 4 -

1   for the space," given Parkway's lengthy and unexplained delay in providing its Consent.  Mr.

2   Mooney did not respond to Mr. Robinson's concern that Zenefits and/or Parkway might be

3   contemplating another deal or option related to the seventh floor of Hayden Ferry III.

4        24.   By letter dated August 31, 2016, counsel for Parkway advised Zenefits that

5   Parkway was "withholding the granting of its consent to the proposed sublease," because of "the

6   financial strength of AmeriFirst, both in terms of net worth and in terms of anticipated cash flow

7   over the term of the proposed sublease, and the fact that the business of AmeriFirst is

8   substantially similar to the business of another [unidentified] tenant leasing space in the

9   Building and so is not in accord with Parkway's desired tenant mix within the Building."

10        25.   Upon information and belief, the reasons given by Parkway for withholding its

11   Consent were pretextual.  Parkway had never expressed concerns about AmeriFirst's financial

12   condition, including during the time period when Parkway was proposing a direct lease with

13   AmeriFirst, and AmeriFirst's financials only grew stronger after that time.   AmeriFirst's

14   financials are not only strong, but secondary and incremental to Zenefits' financials as the

15   primary tenant.   Nor had Parkway ever expressed concerns about the so-called "tenant mix" in

16   Hayden Ferry III, including during the time when Parkway was pursuing AmeriFirst as a

17   potential direct lessee.  Upon information and belief, there are no other tenants in the mortgage

18   industry in Hayden Ferry III.

19        26.   Upon information and belief, the real reason Parkway withheld its Consent was

20   because Zenefits and/or Parkway had identified a different prospective tenant – after the

21   Sublease had already been executed and the parties had circulated the Consent – that was

22   interested in subleasing three contiguous floors from Zenefits (the seventh, eighth and ninth

23   floors), and both Zenefits and Parkway believed such an agreement would be more lucrative

24   than the agreement previously reached with AmeriFirst. Thus, Parkway, in concert with

25   Zenefits, unlawfully withheld its Consent in an effort to attempt to avoid the binding nature of

26   the Sublease between AmeriFirst and Zenefits.

27

28

## COUNT ONE
### (Breach of Contract - Zenefits)

27.     AmeriFirst hereby repeats and realleges the allegations set forth in the preceding paragraphs, as though fully set forth herein and incorporates the same herein by this reference.

28.     AmeriFirst and Zenefits entered into a Sublease whereby Zenefits agreed to sublease to AmeriFirst space on the seventh floor of Hayden Ferry III.

29.     Zenefits has breached the Sublease.

30.     As a result of Zenefits' breach of the Sublease, AmeriFirst has been damaged.

31.     Pursuant to A.R.S. § 12-341.01, AmeriFirst is entitled to the recovery of its attorney's fees.

## COUNT TWO
### (Breach of Covenant of Good Faith and Fair Dealing - Zenefits)

32.     AmeriFirst hereby repeats and realleges the allegations set forth in the preceding paragraphs, as though fully set forth herein and incorporates the same herein by this reference.

33.     The Sublease includes the covenant of good faith and fair dealing implied in every contract under Arizona law.

34.     Zenefits breached its duty of good faith and fair dealing by impairing the rights of AmeriFirst to receive the benefits of the Sublease.

35.     As a result of Zenefits' breach of the covenant of good faith and fair dealing, AmeriFirst has been damaged.

36.     Because this claim arises out of contract, AmeriFirst is entitled to the recovery of its attorney's fees pursuant to A.R.S. § 12-341.01.

## COUNT THREE
### (Tortious Interference with Contract or Business Expectancy - Parkway)

37.     AmeriFirst hereby repeats and realleges the allegations set forth in the preceding paragraphs, as though fully set forth herein and incorporates the same herein by reference.

38.     Zenefits and AmeriFirst entered into the Sublease, and expected to obtain Parkway's consent, which could not unreasonably be withheld under the terms of the Commercial Lease between Zenefits and Parkway.

39.     Parkway was aware of Zenefits' Sublease with AmeriFirst, as evidenced in part by the fact that Parkway's counsel edited the Consent before Mr. Mooney indicated to Zenefits and AmeriFirst that its representatives' signatures would be forthcoming in "no more than a day or two."

40.     Parkway engaged in intentional interference inducing or causing a breach of the Sublease or expectancy of a sublease through its unreasonable denial of approval of the Sublease.

41.     Parkway's conduct was improper.

42.     Parkway's improper interference caused resulting damage to AmeriFirst.

**COUNT FOUR**
**(Aiding and Abetting Tortious Interference - Zenefits)**

43.     AmeriFirst hereby repeats and realleges the allegations set forth in the preceding paragraphs, as though fully set forth herein and incorporates the same herein by reference.

44.     Parkway tortiously interfered with the Sublease between AmeriFirst and Zenefits, causing injury to AmeriFirst.

45.     Zenefits knew that Parkway's unlawful conduct constituted tortious interference.

46.     Zenefits substantially assisted and/or encouraged Parkway in its tortious interference with the Sublease.

**COUNT FIVE**
**(Promissory Estoppel – Zenefits and Parkway)**

47.     AmeriFirst hereby repeats and realleges the allegations set forth in the preceding paragraphs, as though fully set forth herein and incorporates the same herein by reference.

48.     Both Zenefits and Parkway agreed to the Sublease and executed the Consent or indicated its executed Consent would be forthcoming in "no more than a day or two."

49.     Defendants expected, or reasonably should have expected, that their promise to execute the Consent and move forward with the Sublease would cause or induce AmeriFirst to incur significant costs in architectural planning, internal planning, legal fees, foregone lease opportunities and other items in reliance upon those promises.

50.     AmeriFirst did rely on Defendants' promises to its detriment.

51.     AmeriFirst's reliance on Defendants' promises was justifiable.

52.     AmeriFirst has been damaged by its justifiable reliance on Defendants' promises.

## COUNT SIX
### (Conspiracy to Interfere with Contract or Business Expectancy – Zenefits and Parkway)

53.     AmeriFirst hereby repeats and realleges the allegations set forth in the preceding paragraphs, as though fully set forth herein and incorporates the same herein by reference.

54.     Zenefits and Parkway agreed to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, namely to interfere with AmeriFirst's Sublease or expectancy of a sublease with Zenefits and to deprive AmeriFirst of the benefits of the Sublease by, upon information and belief, colluding to sublease the subleased premises to a different potential tenant seeking space on three contiguous floors.

55.     Zenefits and Parkway did accomplish an underlying tort – i.e., tortious interference with a contract or business expectancy.

56.     Zenefits and Parkway agreed to, commonly planned, took part in, and/or cooperated in committing the unlawful acts alleged herein.

57.     AmeriFirst has been damaged as a result of these acts.

## COUNT SEVEN
### (Injunctive Relief – Zenefits and Parkway)

58.     AmeriFirst hereby repeats and realleges the allegations set forth in the preceding paragraphs, as though fully set forth herein and incorporates the same herein by reference.

59.     Based on the facts referenced above, AmeriFirst has a strong likelihood of prevailing on the merits of its Verified Complaint and Request for Injunctive Relief.

60.     AmeriFirst has suffered and will continue to suffer immediate and irreparable injury, loss, and damage unless Defendants are enjoined to provide the space on the seventh floor of Hayden Ferry III to AmeriFirst.

61.     The balance of hardships favors AmeriFirst and AmeriFirst has no adequate remedy at law.

62.     The grant of injunctive relief will protect the public interest and AmeriFirst's interests.

### **PRAYER FOR RELIEF**

AmeriFirst requests that this Court enter judgment in its favor and against Defendants, and that AmeriFirst be awarded injunctive relief, specific performance and damages to which it is entitled, including but not limited to:

A.     Specific performance of the Sublease;

B.     Preliminary and permanent injunctive relief;

C.     Damages stemming from Zenefits' breach of the Sublease;

D.     Damages stemming from Parkway's interference with AmeriFirst's Sublease with Zenefits;

E.     Attorneys' fees pursuant to A.R.S. § 12-341.01;

F.     Pre- and post-judgment interest on any damage award at the legal rate; and

G.     Such other and further relief as the Court deems just and proper.

**DATED** this 9th day of September, 2016.

RYLEY CARLOCK & APPLEWHITE

By_____
    Rodolfo Parga, Jr.
    Andrea G. Lovell
    One North Central Avenue, Suite 1200
    Phoenix, Arizona 85004-4417
    Attorneys for Plaintiff AmeriFirst
    Financial, Inc.

**VERIFICATION**

STATE OF ARIZONA )
) ss.
County of Maricopa )

       Erik Lutz, pursuant to Rule 80(i) of the *Arizona Rules of Civil Procedure*, declares as follows:

       1.     I am the President of the Plaintiff, AmeriFirst Financial, Inc., in the above-captioned lawsuit and am duly authorized to make this Verification on behalf of AmeriFirst Financial, Inc.

       2.     I have read the Verified Complaint and Request for Injunctive Relief to which this Verification is attached, am aware of the contents thereof, and am informed and believe the contents are well grounded in fact and true to the best of my knowledge, information, and belief.

       **I declare under penalty of perjury that the foregoing is true and correct.**

Executed this _9_ day of September, 2016.

Erik Lutz
President, AmeriFirst Financial, Inc.

COPY

SEP 09 2016

MICHAEL K. JEANES, CLERK
J. BAKER
DEPUTY CLERK

1

2

3

4     **RYLEY CARLOCK & APPLEWHITE**
      One North Central Avenue, Suite 1200
5     Phoenix, AZ 85004-4417
      Telephone 602.440.4800
6     Fax 602.257.9582

7     Rodolfo Parga, Jr. (Bar No. 15514)
      rparga@rcalaw.com
8     Andrea G. Lovell (Bar No. 19882)
      alovell@rcalaw.com
9

10    Attorneys for Plaintiff AmeriFirst

11           **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

12               **IN AND FOR THE COUNTY OF MARICOPA**

13    AMERIFIRST FINANCIAL, INC.,

14              Plaintiff,                    Case No. CV 2016-014888

15    v.                                      **PLAINTIFF'S VERIFIED
                                              APPLICATION FOR:  (1) TEMPORARY
16    PKY FUND II PHOENIX III, LLC, a         RESTRAINING ORDER AND
      Delaware limited liability company and  PRELIMINARY INJUNCTION WITH
17    YOURPEOPLE, INC., a Delaware            NOTICE; AND (2) PERMANENT
      corporation d/b/a ZENEFITS FTW          MANDATORY INJUNCTION
18    INSURANCE SERVICES,

19              Defendants.

20

21          Plaintiff AmeriFirst Financial, Inc. ("AmeriFirst" or "Plaintiff"), pursuant to the

22    provisions of Rule 65, Ariz.R.Civ.P., submits this Application and respectfully requests that the

23    Court:

24          (A)    Issue forthwith a Temporary Restraining Order and a Preliminary Injunction

25                 restraining and enjoining Defendants and Defendants' agents, servants and

26                 employees and any and all persons acting in concert or participation with

27                 Defendants, from leasing and/or subleasing the seventh floor of the Hayden Ferry

28

      4064595.1
      09/09/16

1    Lakeside Phase III building located at 40 E. Rio Salado Parkway, Tempe, Arizona
2    85281;

3    (B)    Issue forthwith a Temporary Restraining Order and a Preliminary Injunction
4           requiring Defendants to provide AmeriFirst with possession of the seventh floor of
5           the Hayden Ferry Lakeside Phase III building located at 40 E. Rio Salado
6           Parkway, Tempe, Arizona 85281 by enforcing the terms of the written Sublease
7           between AmeriFirst and Zenefits; and

8    (C)    Enter Judgment in favor of AmeriFirst and award AmeriFirst its reasonable
9           attorney's fees and costs.

10   This Application is supported by the Verified Complaint and Request for Injunctive
11   Relief filed in this action, and the accompanying Memorandum of Points and Authorities.

12   DATED this 9th day of September, 2016.

14                                        RYLEY CARLOCK & APPLEWHITE

16                                        _____
                                         Rodolfo Parga, Jr.
17                                        Andrea G. Lovell
                                         One North Central Avenue, Suite 1200
18                                        Phoenix, AZ 85004-4417
                                         Attorneys for Plaintiff AmeriFirst

- 2 -

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   FACTS

This case arises from Defendants PKY Fund II Phoenix III, LLC ("Parkway") and YourPeople, Inc. d/b/a Zenefits FTW Insurance Services ("Zenefits") conspiring and colluding with one another to deprive AmeriFirst of the benefit, as described more fully below, of a sublease agreement for certain office space, all so that Defendants could unlawfully better their respective financial positions at AmeriFirst's expense.

### A.   AmeriFirst Enters Into Discussions With Parkway To Lease Certain Space In Hayden Ferry III

On or about June 19, 2015, Parkway and Zenefits entered into a ten-year Commercial Lease (the "Commercial Lease"), pursuant to which Zenefits leased several floors (the second, third, seventh, eighth and ninth floors) from Parkway in a building known as the Hayden Ferry Lakeside Phase III building ("Hayden Ferry III") located at 40 E. Rio Salado Parkway, Tempe, Arizona 85281.  (Verified Complaint ¶ 7).

In or about December 2015, AmeriFirst, a long-established mortgage banking company headquartered in Maricopa County, expressed to Parkway an interest in leasing space in Hayden Ferry III.  AmeriFirst originates approximately $2,000,000,000 in mortgage loans each year, employs over 500 people and has approximately 35 offices.  The proposed space would be for headquarters operations as well as some loan production.  AmeriFirst and Parkway first discussed the possibility of AmeriFirst leasing space on the ground floor of Hayden Ferry III. When it became clear that the ground floor space was not suitable for AmeriFirst's needs, AmeriFirst and Parkway next discussed the possibility of AmeriFirst leasing space on the fourth floor of Hayden Ferry III.  (Verified Complaint ¶¶ 8-10).

In connection with their discussions about the possibility of AmeriFirst leasing space on the fourth floor of Hayden Ferry III, Parkway requested and reviewed detailed information concerning AmeriFirst's financial condition.  Parkway did not express any concerns about

AmeriFirst's financial condition or about the tenant mix in Hayden Ferry III. Instead, in or about February 2016, Parkway proposed a draft lease for AmeriFirst's consideration. AmeriFirst ultimately did not lease the space on the fourth floor of Hayden Ferry III. (Verified Complaint ¶ 11).

**B.   AmeriFirst Becomes Aware Of The Availability Of Certain Zenefits Rentable Space in Hayden Ferry III And Enters Into A Sublease**

In or about March 2016, AmeriFirst learned that Zenefits was seeking a tenant to sublease its space on the third floor of Hayden Ferry III. AmeriFirst and Zenefits entered into a Letter of Intent whereby AmeriFirst would sublease space on the third floor of Hayden Ferry III and Zenefits would provide to AmeriFirst certain furniture, fixtures and equipment ("FF&E"), including but not limited to mounted television monitors, video-conferencing equipment, Wi-Fi equipment and appliances. (Verified Complaint ¶ 12).

Despite the parties' Letter of Intent, in or about June 2016, Zenefits asked AmeriFirst whether it would consider subleasing space on the seventh floor of Hayden Ferry III (which would include FF&E valued at approximately $300,000.00 less than the FF&E on the third floor), as opposed to the space on the third floor that the parties had been discussing. The discussions acknowledged the trade-off of the reduced FF&E on the seventh floor for the value of being on a higher floor, thus leaving the rental rate unchanged. Ultimately, AmeriFirst agreed to sublease space on the seventh floor of Hayden Ferry III, and AmeriFirst and Zenefits entered into a written Sublease dated July 1, 2016 (the "Sublease"). Pursuant to paragraph 38 of the Commercial Lease between Zenefits and Parkway, Zenefits was permitted to sublease its leased space in Hayden Ferry III with the written consent of Parkway, "which consent shall not be unreasonably withheld, conditioned or delayed." (Verified Complaint ¶¶ 13-15).

**C.   AmeriFirst and Zenefits Execute And Comment On A Consent Of Landlord Containing Parkway's Edits, and Parkway Indicates Its Consent Will Be Forthcoming**

In late July 2016, all parties exchanged and commented on drafts of a Consent of Landlord (the "Consent"), whereby Parkway would consent to AmeriFirst's sublease from Zenefits of space on the seventh floor of Hayden Ferry III. On or about July 28, 2016, counsel

for Parkway sent an e-mail message attaching clean and redlined versions of the Consent and indicating that "[w]e just need to get permission to slip page the executed signature pages into the clean version of the Consent attached to this email." In response, representatives of both AmeriFirst and Zenefits signed the Consent. (Verified Complaint ¶ 16).

On or about August 2, 2016, in response to Zenefits' broker, Nathan Zoucha, inquiring "when we can expect a fully executed [Consent] agreement," Parkway Vice President Matt Mooney responded that he "should be back to you guys in no more than a day or two with both signatures." At no time did Mr. Mooney or any other Parkway representative express any concerns about AmeriFirst's financial condition or the tenant mix in Hayden Ferry III. (Verified Complaint ¶¶ 17-18).

On or about August 3, 2016, AmeriFirst's broker, James Robinson, followed up with Mr. Mooney, asking "[a]ny word on approval of the floor plan?" Later on August 3, 2016, Mr. Zoucha of Zenefits inquired of AmeriFirst whether AmeriFirst would reconsider subleasing space on the third floor of Hayden Ferry III, as opposed to the seventh floor of Hayden Ferry III. Mr. Zoucha did not explain the reason for this unexpected request, and AmeriFirst ultimately indicated that it wished to proceed with the Sublease that had already been executed for the space on the seventh floor, and for which the parties were merely awaiting Parkway's consent. (Verified Complaint ¶¶ 19-20).

**D. Parkway Suddenly Reverses Course And Refuses To Consent To The Sublease, Providing Pretextual Reasons For Its Refusal**

AmeriFirst incurred significant costs in architectural planning, internal planning, legal fees, foregone lease opportunities and other items in reliance upon Zenefits' execution of the Sublease and Consent, and Parkway's indication that its executed version of the Consent would be forthcoming shortly. (Verified Complaint ¶ 21).

Having still not received the executed Consent from Parkway, AmeriFirst sent a letter to Zenefits dated August 25, 2016, requesting that Zenefits take immediate action to obtain Parkway's executed Consent. AmeriFirst explained that its ability to continue with planning, permitting and construction was being materially impaired by the lack of the executed Consent,

and that AmeriFirst was losing its own use of the space, as well as incurring holdover rent costs in its existing facilities.   (Verified Complaint ¶ 22).

Also on August 25, 2016, AmeriFirst's broker, Mr. Robinson inquired of Mr. Mooney whether he could confirm that there was "no other deal or option being contemplated for the space," given Parkway's lengthy and unexplained delay in providing its Consent.  Mr. Mooney did not respond to Mr. Robinson's concern that Zenefits and/or Parkway might be contemplating another deal or option related to the seventh floor of Hayden Ferry III.  (Verified Complaint ¶ 23).

By letter dated August 31, 2016, counsel for Parkway advised Zenefits that Parkway was "withholding the granting of its consent to the proposed sublease," because of "the financial strength of AmeriFirst, both in terms of net worth and in terms of anticipated cash flow over the term of the proposed sublease, and the fact that the business of AmeriFirst is substantially similar to the business of another [unidentified] tenant leasing space in the Building and so is not in accord with Parkway's desired tenant mix within the Building."  (Verified Complaint ¶ 24).

Upon information and belief, the reasons given by Parkway for withholding its Consent were pretextual.  Parkway had never expressed concerns about AmeriFirst's financial condition, including during the time period when Parkway was proposing a direct lease with AmeriFirst, and AmeriFirst's financials only grew stronger after that time.  AmeriFirst's financials are not only strong, but secondary and incremental to Zenefits' financials as the primary tenant.  Nor had Parkway ever expressed concerns about the so-called "tenant mix" in Hayden Ferry III, including during the time when Parkway was pursuing AmeriFirst as a potential direct lessee.  Upon information and belief, there are no other tenants in the mortgage industry in Hayden Ferry III.  (Verified Complaint ¶ 25).

Upon information and belief, the real reason Parkway withheld its Consent was because Zenefits and/or Parkway had identified a different prospective tenant – after the Sublease had already been executed and the parties had circulated the Consent – that was interested in subleasing three contiguous floors from Zenefits (the seventh, eighth and ninth floors), and both

Zenefits and Parkway believed such an agreement would be more lucrative than the agreement previously reached with AmeriFirst.   Thus, Parkway, in concert with Zenefits, unlawfully withheld its Consent in an effort to attempt to avoid the binding nature of the Sublease between AmeriFirst and Zenefits.  (Verified Complaint ¶ 26).

## II.   ANALYSIS

The specific procedures governing the issuance of injunctive relief are set forth in Rule 65, Ariz.R.Civ.P, which provides that a party seeking a temporary restraining order or preliminary injunction must establish the following:

- A likelihood that the moving party will succeed at trial on the merits;
- The possibility of irreparable injury to the moving party which cannot be remedied by damages should injunctive relief not be granted;
- A balance of hardships that favors the moving party; and
- The existence of public policy favoring the injunction.

*Shoen v. Shoen*, 167 Ariz. 58, 804 P.2d 787 (App. 1990).  Moreover, as the balance of hardships and overall equities tip in favor of the moving party, the moving party's obligation to demonstrate a likelihood of success on the merits decreases.  *Aleknajik Natives, Ltd. v. Andres*, 648 F.2d 496, 502 (9th Cir. 1980).

Here, the requested injunctive relief is the appropriate remedy for addressing Defendants' unlawful conduct in attempting to deprive AmeriFirst of the benefits of the Sublease, in order to place themselves in better financial positions.  As set forth below, AmeriFirst meets each of the four criteria listed above and, therefore, is entitled to injunctive relief.

### A.   **AmeriFirst Will Prevail on the Merits at Trial.**

At trial, AmeriFirst will show:

- **Zenefits breached its Sublease with AmeriFirst.**

In order to prevail on a claim for breach of contract, the plaintiff must prove the existence of a contract between the plaintiff and defendant, a breach of the contract by the defendant, and resulting damage to the plaintiff.  *See Clark v. Compania Ganadera de Cananea S.A.*, 95 Ariz.

90, 94, 387 P.2d 235, 238 (1963); *Graham v. Asbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975); *Chartone, Inc. v. Bernini*, 207 Ariz. 162, 170 83 P.3d 1103, 1111 (App. 2004).

Zenefits and AmeriFirst entered into a valid and enforceable Sublease. As discussed in detail above, Zenefits breached the Sublease by colluding with Parkway to deprive AmeriFirst of the benefits of the Sublease and to benefit financially (by replacing AmeriFirst with another tenant Zenefits viewed as more favorable) at AmeriFirst's expense. AmeriFirst has been damaged by Zenefits' breach of the Sublease.

- **Zenefits breached the Covenant of Good Faith and Fair Dealing.**

There is in every contract under Arizona law an implied covenant of good faith and fair dealing, *i.e.*, that neither party will take any actions that prevents the other from obtaining the benefit of their bargain. *See Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985). A contracting party who "act[s] to impair the right of the other [contracting party] to receive the benefits which flow from their agreement" breaches the duty imposed by the implied covenant of good faith and fair dealing. *Rawlings v. Apodaca*, 151 Ariz. 149, 153-54, 726 P.2d 565, 569-70 (1986) (citing cases); *see also Wagenseller*, 147 Ariz. at 385, 710 P.2d at 1040 (stating that "the implied-in-law covenant of good faith and fair dealing protects the rights of the parties to an agreement to receive the benefits of the agreement that they have entered into. The denial of a party's right to those benefits, whatever they are, will breach the duty of good faith implicit in the contract.").

Zenefits breached the implied covenant of good faith and fair dealing by colluding with Parkway to prevent AmeriFirst from obtaining the benefits of the Sublease. AmeriFirst has been damaged as a result.

- **Parkway has improperly interfered with AmeriFirst's Contract, Or, Alternatively Business Expectancy.**

To prevail on its claim for tortious interference, AmeriFirst must prove: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the Defendants; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) resultant damage to the party whose

relationship or expectancy has been disrupted; and (5) an improper motive or means. *Neonatology Assocs., Ltd. v. Phoenix Perinatal Assoc. Inc.*, 216 Ariz. 185, 187, ¶ 7, 164 P.3d 691, 693 (Ct. App. 2007).

Zenefits and AmeriFirst had a valid Sublease or expectancy of a sublease, and Parkway was aware of the relationship or expectancy, as evidenced in part by the fact that Parkway reviewed the Sublease and edited the Consent.   Parkway interfered with the Sublease or expectancy of a sublease by unreasonably withholding its Consent, despite having earlier indicated that its signatures on the Consent would be forthcoming in "no more than a day or two."   Parkway's interference was both intentional and improper, as -- upon information and belief – Parkway colluded with Zenefits to unreasonably withhold its Consent and deprive AmeriFirst of the benefits of the Sublease in order to benefit itself and Zenefits by entering into a more favorable arrangement with a different potential tenant seeking space on three contiguous floors. AmeriFirst has suffered resultant damage.

- **Zenefits Aided and Abetted Parkway's Tortious Interference with the Sublease.**

Aiding and abetting requires that the primary tortfeasor commit a tort that causes injury to the plaintiff, that the defendant knows that the primary tortfeasor's conduct is unlawful, and the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the unlawful conduct. *See Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 485, ¶ 34, 38 P.3d 12, 23 (2002) (en banc).

Parkway tortiously interfered with the Sublease between AmeriFirst and Zenefits, causing injury to AmeriFirst.   Zenefits knew that Parkway's unlawful conduct constituted tortious interference.   Zenefits substantially assisted and/or encouraged Parkway in its tortious interference with the Sublease.

- **AmeriFirst Justifiably and Detrimentally Relied Upon Defendants' Promises and Incurred Substantial Damages as a Result.**

To prove promissory estoppel, Plaintiff must show that Defendants made a promise and should have reasonably foreseen that Plaintiff would rely on that promise, and Plaintiff must

1  also show that it actually relied on the promise to its detriment. *Higginbottom v. State*, 203 Ariz.

2  139, 144, 51 P.3d 972, 977 (Ct. App. 2002).

3       Both Zenefits and Parkway agreed to the Sublease and executed the Consent or indicated

4  its executed Consent would be forthcoming in "no more than a day or two."   Defendants

5  expected, or reasonably should have expected, that their promise to execute the Consent and

6  move forward with the Sublease would cause or induce AmeriFirst to incur significant costs in

7  architectural planning, internal planning, legal fees, foregone lease opportunities and other items

8  in reliance upon those promises.  AmeriFirst did rely on Defendants' promises to its detriment,

9  and its reliance was justifiable.   AmeriFirst has been damaged by its justifiable reliance on

10 Defendants' promises.

11      •    **Defendants have conspired to deprive AmeriFirst of the benefits of the**

12 **Sublease.**

13      Liability for civil conspiracy requires that two or more individuals agree and thereupon

14 accomplish "an underlying tort which the alleged conspirators agreed to commit." *Wells Fargo*,

15 201 Ariz. at 498, ¶ 99, 38 P.3d at 36.   Zenefits and Parkway cooperated and agreed to

16 accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, namely

17 to interfere with AmeriFirst's Sublease or expectancy of a sublease with Zenefits and to deprive

18 AmeriFirst of the benefits of the Sublease by, upon information and belief, colluding to sublease

19 the subleased premises to a different potential tenant seeking space on three contiguous floors.

20 Zenefits and Parkway accomplished an underlying tort -- i.e., tortious interference with a

21 contract or business expectancy, and AmeriFirst has been damaged as a result of their acts.

22      •    **AmeriFirst is entitled to equitable relief/specific performance.**

23      AmeriFirst is entitled to equitable relief/specific performance because the seventh floor

24 of Hayden Ferry III is unique to AmeriFirst and no viable, adequate or appropriate remedy exists

25 at law. *See How v. Fulkerson*, 22 Ariz. App. 467, 469, 528 P.2d 853, 855 (1974) (observing that

26 "courts usually find that where the sale of real estate is involved there is no adequate remedy at

27 law").

28

Specific performance is warranted where, as here, there is a contract, the terms of the contract are certain and fair, there is an absence of inequitable conduct on AmeriFirst's part, there is an absence of hardship to Defendants or the public outweighing the benefit to the plaintiff from performance of the contract, and there is no other adequate remedy at law. *Id.*

If Defendants are allowed to continue to deprive AmeriFirst of the Sublet Space, AmeriFirst will suffer serious damage. The only way to prevent that is injunctive relief.

**B.    Defendants' Conduct Threatens Immediate, Continuing and Irreparable Injury to AmeriFirst That Cannot be Adequately Remedied by the Award of Money Damages.**

The seventh floor space in Hayden Ferry III is a unique asset to AmeriFirst that is not capable of replication. AmeriFirst devoted substantial resources toward identifying and believing it had secured the seventh floor space. In doing so, AmeriFirst had not developed an equally beneficial backup plan because it believed, based on the signed Sublease and the assurances received from Parkway, it would be receiving the required Consent from Parkway, which could not be unreasonably withheld. Aside from the favorable lease rates for the seventh floor space, AmeriFirst had based its decision to relocate to that space on the ability of the space to help increase recruiting of new employees and improve the overall morale of its workforce that would work out of, arguably, the finest Class A commercial space in Arizona. In anticipation of the move, AmeriFirst had conveyed the positive news to talent it was trying to recruit, the business community in general, and its own workforce. There is no adequate remedy other than an injunction, and an injunction is appropriate.

**C.    The Balance of Hardships Weighs in Favor of AmeriFirst.**

AmeriFirst is faced with the irreparable harm of losing the ability to obtain possession of the seventh floor space in Hayden Ferry III if Defendants are allowed to lease or sublease the same space to another tenant, which, on information and belief, AmeriFirst believes is already in motion. Defendants are merely enjoined from leasing or subleasing the seventh floor space. All of Defendants' rights and remedies in the underlying suit are preserved. The injunction merely stops Defendants from unlawfully depriving AmeriFirst of the possibility to obtain possession of the seventh floor space, a unique and unreplicable asset to AmeriFirst. If Defendants' defenses

are legitimate, they can present them to the Court. Defendants have a remedy. Without an injunction, AmeriFirst does not.

### D. Public Policy Supports AmeriFirst's Claims.

Finally, public policy also favors injunctive relief. The public interest is served where, as here, courts enforce valid contractual agreements into which parties have voluntarily entered. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz*, 298 F. Supp. 2d 27, 34-35 (D.D.C. 2002).

## III. SECURITY FOR INJUNCTION

AmeriFirst respectfully requests, pursuant to Rule 65 of the *Arizona Rules of Civil Procedure*, that it be allowed to provide a nominal amount of security, if any, for payment of costs and damages as may be incurred by Defendants if they are found to be wrongfully enjoined or restrained.

## IV. CONCLUSION

As set forth above, AmeriFirst has met each of the criteria required for this Court to exercise its equitable powers and grant the injunctive relief requested. In fact, Defendants' inequitable conduct, combined with the extreme and irreparable harm AmeriFirst will suffer if an injunction is not granted, require this result.

Based on the facts of this case, AmeriFirst is entitled to temporary and permanent injunctive relief wherein the Court:

(A) Issues forthwith a Temporary Restraining Order and a Preliminary Injunction restraining and enjoining Defendants and Defendants' agents, servants and employees and any and all persons acting in concert or participation with Defendants, from leasing and/or subleasing the seventh floor of the Hayden Ferry Lakeside Phase III building located at 40 E. Rio Salado Parkway, Tempe, Arizona 85281;

(B) Issues forthwith a Temporary Restraining Order and a Preliminary Injunction requiring Defendants to provide AmeriFirst with possession of the seventh floor of

1    the Hayden Ferry Lakeside Phase III building located at 40 E. Rio Salado

2    Parkway, Tempe, Arizona 85281 by enforcing the terms of the written Sublease

3    between AmeriFirst and Zenefits; and

4    (C)   Enters Judgment in favor of AmeriFirst and awards AmeriFirst its reasonable

5    attorney's fees and costs.

6

7    **RESPECTFULLY SUBMITTED** this 9th day of September, 2016.

8

9                   RYLEY CARLOCK & APPLEWHITE

10                   By

11                   Rodolfo Parga, Jr.
                        Andrea G. Lovell

12                   One North Central Avenue, Suite 1200
                        Phoenix, Arizona 85004-4417

13                   Attorneys for Plaintiff AmeriFirst
                        Financial, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**VERIFICATION**

2

STATE OF ARIZONA    )
                       ) ss.

3

County of Maricopa     )

4

5

        Erik Lutz, pursuant to Rule 80(i) of the *Arizona Rules of Civil Procedure*, declares

6

as follows:

7

        1.    I am the President of the Plaintiff, AmeriFirst Financial, Inc., in the above-

8

captioned lawsuit and am duly authorized to make this Verification on behalf of AmeriFirst

9

Financial, Inc.

10

        2.    I have read Plaintiff's Verified Application for:   (1) Temporary Restraining

11

Order and Preliminary Injunction with Notice; and (2) Permanent Mandatory Injunction to which this

12

Verification is attached, am aware of the contents thereof, and am informed and believe the

13

contents are well grounded in fact and true to the best of my knowledge, information, and belief.

14

        **I declare under penalty of perjury that the foregoing is true and correct.**

15

        Executed this _9_ day of September, 2016.

16

17

18

                     Erik Lutz

19

                     President, AmeriFirst Financial, Inc.

20

21

22

23

24

25

26

27

28

**RYLEY CARLOCK & APPLEWHITE**
One North Central Avenue, Suite 1200
Phoenix, AZ 85004-4417
Telephone 602.440.4800
Fax 602.257.9582

Rodolfo Parga, Jr. (Bar No. 15514)
rparga@rcalaw.com
Andrea G. Lovell (Bar No. 19882)
alovell@rcalaw.com

Attorneys for Plaintiff AmeriFirst

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| AMERIFIRST FINANCIAL, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>PKY FUND II PHOENIX III, LLC, a Delaware limited liability company and YOURPEOPLE, INC., a Delaware corporation d/b/a ZENEFITS FTW INSURANCE SERVICES,<br><br>        Defendants. | Case No.   CV 2016-014888<br><br>**SUMMONS**<br><br>If you would like legal advice from a lawyer, contact the Lawyer Referral Service at 602-257-4434 or www.maricopalawyers.org Sponsored by the Maricopa County Bar Association |

**THE STATE OF ARIZONA TO THE DEFENDANTS:**

**PKY Fund II Phoenix III, LLC**
**c/o CT Corporation System**
**3800 N. Central Avenue, Suite 460**
**Phoenix, AZ  85012**

    **YOU ARE HEREBY SUMMONED** and required to appear and defend, within the time applicable, in this action in this Court.  If served within Arizona, you shall appear and defend within 20 days after the service of the Summons and Complaint upon you, exclusive of the day of service.  If served out of the State of Arizona -- whether by direct service, by registered or certified mail, or by publication -- you shall appear and defend within 30 days after the service of the summons and Complaint upon you is complete, exclusive of the date of service.  Where

process is served upon the Arizona Director of Insurance as an insurer's attorney to receive service of legal process against it in this state, the insurer shall not be required to appear, answer or plead until expiration of 40 days after date of such service upon the director.   Service by registered or certified mail without the State of Arizona is complete 30 days after the date of filing the receipt and affidavit of service with the Court.   Service by publication is complete 30 days after the date of first publication.   Direct service is complete when made.   Service upon the Arizona Motor Vehicle Superintendent is complete 30 days after filing the Affidavit of Compliance and return receipt or Officer's Return. RCP 4; A.R.S. §§20-222, 28-502, 28-503.

**YOU ARE HEREBY NOTIFIED** that in case of your failure to appear and defend within the time applicable, judgment by default may be rendered against you for the relief demanded in the Complaint.

**YOU ARE CAUTIONED** that in order to appear and defend, you must file an Answer or proper response in writing with the Clerk of this court, accompanied by the necessary filing fee, within the time required, and you are required to serve a copy of any Answer or response upon the Plaintiffs' attorney.  RCP 10(d); A.R.S. §12-311; RCP 5.

(1) Requests for reasonable accommodation for persons with disabilities must be made to the division assigned to the case by the party needing accommodation or his/her counsel at least three (3) judicial days in advance of a scheduled court proceeding.

(2) Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

The name and address of the plaintiff's attorney is:

Rodolfo Parga, Jr.
Andrea G. Lovell
**RYLEY CARLOCK & APPLEWHITE**
One North Central Avenue, Suite 1200
Phoenix, Arizona 85004
(602) 440-4800

**SIGNED AND SEALED** this date:_____

COPY

SEP 09 2016

CLERK
MICHAEL K. JEANES, CLERK
J. BAKER
DEPUTY CLERK

By_____
Deputy Clerk

- 2 -

1

2

3

4   **RYLEY CARLOCK & APPLEWHITE**
    One North Central Avenue, Suite 1200
5   Phoenix, AZ 85004-4417
    Telephone 602.440.4800
6   Fax 602.257.9582

7   Rodolfo Parga, Jr. (Bar No. 15514)
    rparga@rcalaw.com
8   Andrea G. Lovell (Bar No. 19882)
    alovell@rcalaw.com
9

10  Attorneys for Plaintiff AmeriFirst

11          **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

12            **IN AND FOR THE COUNTY OF MARICOPA**

13  AMERIFIRST FINANCIAL, INC.,

14          Plaintiff,                    Case No.   CV 2 0 1 6 - 0 1 4 8 8 8

15  v.                                          **SUMMONS**

16  PKY FUND II PHOENIX III, LLC, a
    Delaware limited liability company and    If you would like legal advice from a lawyer,
17  YOURPEOPLE, INC., a Delaware               contact the Lawyer Referral Service at
    corporation d/b/a ZENEFITS FTW                      602-257-4434
18  INSURANCE SERVICES,                                      or
                                                   www.maricopalawyers.org
19          Defendants.                              Sponsored by the
                                              Maricopa County Bar Association
20

21  **THE STATE OF ARIZONA TO THE DEFENDANTS:**

22              **YourPeople, Inc. d/b/a Zenefits FTW Insurance Services**
                              **c/o CT Corporation System**
23                         **3800 N. Central Avenue, Suite 460**
                                 **Phoenix, AZ  85012**
24

25          **YOU ARE HEREBY SUMMONED** and required to appear and defend, within the time
    applicable, in this action in this Court.  If served within Arizona, you shall appear and defend
26  within 20 days after the service of the Summons and Complaint upon you, exclusive of the day
    of service.  If served out of the State of Arizona -- whether by direct service, by registered or
27  certified mail, or by publication -- you shall appear and defend within 30 days after the service
    of the summons and Complaint upon you is complete, exclusive of the date of service.  Where
28  process is served upon the Arizona Director of Insurance as an insurer's attorney to receive

    4063366.1
    09/09/16

service of legal process against it in this state, the insurer shall not be required to appear, answer or plead until expiration of 40 days after date of such service upon the director.  Service by registered or certified mail without the State of Arizona is complete 30 days after the date of filing the receipt and affidavit of service with the Court.  Service by publication is complete 30 days after the date of first publication.  Direct service is complete when made.  Service upon the Arizona Motor Vehicle Superintendent is complete 30 days after filing the Affidavit of Compliance and return receipt or Officer's Return.  RCP 4; A.R.S. §§20-222, 28-502, 28-503.

**YOU ARE HEREBY NOTIFIED** that in case of your failure to appear and defend within the time applicable, judgment by default may be rendered against you for the relief demanded in the Complaint.

**YOU ARE CAUTIONED** that in order to appear and defend, you must file an Answer or proper response in writing with the Clerk of this court, accompanied by the necessary filing fee, within the time required, and you are required to serve a copy of any Answer or response upon the Plaintiffs' attorney.  RCP 10(d); A.R.S. §12-311; RCP 5.

(1)   Requests for reasonable accommodation for persons with disabilities must be made to the division assigned to the case by the party needing accommodation or his/her counsel at least three (3) judicial days in advance of a scheduled court proceeding.

(2)   Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

The name and address of the plaintiff's attorney is:

Rodolfo Parga, Jr.
Andrea G. Lovell
**RYLEY CARLOCK & APPLEWHITE**
One North Central Avenue, Suite 1200
Phoenix, Arizona 85004
(602) 258-7701

**SIGNED AND SEALED** this date:_____

COPY

SEP 09 2016

**CLERK**
MICHAEL K. JEANES, CLERK
J. BAKER
DEPUTY CLERK

By _____
Deputy Clerk



COPY

SEP 09 2016

MICHAEL K. JEANES, CLERK
J. BAKER
DEPUTY CLERK

1

**RYLEY CARLOCK & APPLEWHITE**
2   One North Central Avenue, Suite 1200
Phoenix, AZ 85004-4417
3   Telephone 602.440.4800
Fax 602.257.9582

4
Rodolfo Parga, Jr. (Bar No. 15514)
5   rparga@rcalaw.com
Andrea G. Lovell (Bar No. 19882)
6   alovell@rcalaw.com

7   Attorneys for Plaintiff AmeriFirst Financial, Inc.

8              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

9                **IN AND FOR THE COUNTY OF MARICOPA**

10  AMERIFIRST FINANCIAL, INC.,

11            Plaintiff,             Case No.  CV 2016-014888

12  v.                               **CERTIFICATE OF COMPULSORY**
                                     **ARBITRATION**
13  PKY FUND II PHOENIX III, LLC, a
Delaware limited liability company, and
14  YOURPEOPLE, INC., a Delaware
corporation d/b/a ZENEFITS FTW
15  INSURANCE SERVICES,

16            Defendants.

17

18       The undersigned certifies that this case is not subject to compulsory arbitration under

19  Rules 72 through 76 of the Arizona Rules of Civil Procedure because Plaintiff seeks affirmative

20  relief other than a money judgment, in the form of injunctive relief, and damages exceed the

21  compulsory arbitration limits.

22       DATED this 9th day of September, 2016.

23
                                     **RYLEY CARLOCK & APPLEWHITE**
24

25
                                     Rodolfo Parga, Jr.
26                                   Andrea G. Lovell
                                     One North Central Avenue, Suite 1200
27                                   Phoenix, AZ 85004-4417
                                     Attorneys for Plaintiff AmeriFirst Financial,
28                                   Inc.

4063855.1
09/08/16



SEP 0 9 2016

MICHAEL K. JEANES, CLERK
J. BAKER
DEPUTY CLERK

**RYLEY CARLOCK & APPLEWHITE**
One North Central Avenue, Suite 1200
Phoenix, AZ 85004-4417
Telephone 602.440.4800
Fax 602.257.9582

Rodolfo Parga, Jr. (Bar No. 15514)
rparga@rcalaw.com
Andrea G. Lovell (Bar No. 19882)
alovell@rcalaw.com

Attorneys for Plaintiff AmeriFirst Financial, Inc.

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

AMERIFIRST FINANCIAL, INC.,

    Plaintiff,

v.

PKY FUND II PHOENIX III, LLC, a
Delaware limited liability company, and
YOURPEOPLE, INC., a Delaware
corporation d/b/a ZENEFITS FTW
INSURANCE SERVICES,

    Defendants.

Case No.  CV 2016-014888

**TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION
WITH NOTICE**

    The Court having read and considered the Verified Complaint and the Verified Application for Temporary Restraining Order and Preliminary Injunction filed in this action by Plaintiff AmeriFirst Financial, Inc. ("AmeriFirst" or "Plaintiff"), Defendants' Response to Plaintiff's Application for TRO, and having heard testimony and evidence on September __, 2016, and considered the argument of counsel, and it appearing to the Court from the foregoing that a Temporary Restraining Order and Preliminary Injunction is warranted; and

    The Court having determined that unless the Temporary Restraining Order and Preliminary Injunction requested by the Plaintiff is granted, immediate and irreparable injury, loss, or damage will result to the Plaintiff from the Defendants; and

    The Court having further determined that the Plaintiff has no other plain, speedy, or adequate remedy at law:

4063886.1
09/09/16

**NOW, THEREFORE, IT IS HEREBY ORDERED**:

1.     That Defendant PKY Fund II Phoenix III, LLC ("Parkway") and Defendant YourPeople, Inc. d/b/a Zenefits FTW Insurance Services ("Zenefits") (Parkway and Zenefits are collectively referred to as "Defendants") their agents, contractors, subcontractors, employees, representatives, assigns, attorneys, successors-in-interest, and all other persons acting on their behalf or in concert with them are hereby enjoined and restrained from leasing and/or subleasing the seventh floor of the Hayden Ferry Lakeside Phase III building located at 40 E. Rio Salado Parkway, Tempe, Arizona 85281;

2.     Requiring Defendants to provide AmeriFirst with possession of the seventh floor of the Hayden Ferry Lakeside Phase III building located at 40 E. Rio Salado Parkway, Tempe, Arizona 85281, by enforcing the terms of the written Sublease between AmeriFirst and Zenefits;

3.     That any violation of this Temporary Restraining Order and Preliminary Injunction by the Defendants or its officers, agents, contractors, subcontractors, employees, representatives, assigns, attorneys, successors-in-interest, and all other persons acting on their behalf or in concert with them, shall constitute contempt of this Court, and shall render any and all violators subject to punishment accordingly;

4.     That this Temporary Restraining Order and Preliminary Injunction shall be in full force and effect to and including the ____ day of _____, 2016, unless its terms are extended by this Court or done by stipulation of the Parties; and

5.     That, pursuant to Rule 65(e), Arizona rules of Civil Procedure, that Plaintiffs have filed a bond, to be approved by the Court or deposit security with the Clerk of this court, in the sum of $_____ for payment of such costs and damages as may be incurred or suffered by any party found to have been wrongfully enjoined or restrained by this Order.

DONE IN OPEN COURT this _____ day of September, 2016, at the hour of _____ o'clock ____.m.

_____
Judge of the Superior Court

- 2 -

1

**RYLEY CARLOCK & APPLEWHITE**
One North Central Avenue, Suite 1200
2
Phoenix, AZ 85004-4417
Telephone 602.440.4800
3
Fax 602.257.9582

4
Rodolfo Parga, Jr. (Bar No. 15514)
5
rparga@rcalaw.com
Andrea G. Lovell (Bar No. 19882)
6
alovell@rcalaw.com

7
Attorneys for Plaintiff AmeriFirst Financial, Inc.

8
**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
9
**IN AND FOR THE COUNTY OF MARICOPA**

10
AMERIFIRST FINANCIAL, INC.,
11
        Plaintiff,
12
v.
13
PKY FUND II PHOENIX III, LLC, a
Delaware limited liability company, and
14
YOURPEOPLE, INC., a Delaware
corporation d/b/a ZENEFITS FTW
15
INSURANCE SERVICES,
16
        Defendants.
17

Case No.

CV 2016-014888

**ORDER TO SHOW CAUSE FOR
TEMPORARY RESTRAINING ORDER**

18
**TO THE DEFENDANTS:**

19
      Having considered the Verified Application for Temporary Restraining Order and
20
Preliminary Injunction ("Application") filed by Plaintiff AmeriFirst Financial, Inc.
21
("AmeriFirst") against Defendants PKY Fund II Phoenix III, LLC ("Parkway") and YourPeople,
22
Inc. d/b/a Zenefits FTW Insurance Services ("Zenefits") (Parkway and Zenefits are collectively
23
referred to as the "Defendants"); it appearing that AmeriFirst is entitled to protect its interest in
24
the seventh floor of the building known as the Hayden Ferry Lakeside Phase III building located
25
at 40 E. Rio Salado Parkway, Tempe, Arizona 85281, by enforcing the terms of the written
26
Sublease between AmeriFirst and Zenefits, and good cause appearing therefore;
27

28

4063889.1
09/09/16

1    **IT IS HEREBY ORDERED** that Defendants shall show cause before the Honorable

2 _____, Judge of the Superior Court of Arizona, Maricopa County at 201 W. Jefferson,

3 Phoenix, Arizona 85003, on _____ ____, 2016, at _____:_____ __.m., why an

4 order should not be entered granting AmeriFirst a temporary restraining order as requested in the

5 Application.  Oral argument on the Application shall be limited to _____ and

6 divided equally between the parties.

7

8    DONE IN OPEN COURT this ___ day of September, 2016 at ___:_____ __.m.

9

10

11                                        _____

12                                     Judge of the Superior Court of Arizona

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RYLEY CARLOCK & APPLEWHITE**
One North Central Avenue, Suite 1200
Phoenix, AZ 85004-4417
Telephone 602.440.4800
Fax 602.257.9582

Rodolfo Parga, Jr. (Bar No. 15514)
rparga@rcalaw.com
Andrea G. Lovell (Bar No. 19882)
alovell@rcalaw.com

Attorneys for Plaintiff AmeriFirst Financial, Inc.

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| AMERIFIRST FINANCIAL, INC., | Case No.  CV2016-014888 |
| Plaintiff, | |
| v. | **ORDER TO SHOW CAUSE FOR TEMPORARY RESTRAINING ORDER** |
| PKY FUND II PHOENIX III, LLC, a Delaware limited liability company, and YOURPEOPLE, INC., a Delaware corporation d/b/a ZENEFITS FTW INSURANCE SERVICES, | |
| Defendants. | |

**TO THE DEFENDANTS:**

Having reviewed Plaintiff's Verified Complaint and Request for Injunctive Relief and its Verified Application for Temporary Restraining Order and Preliminary Injunction with Notice, and Permanent Mandatory Injunction, both filed on September 9, 2016,

**IT IS ORDERED** that Defendants PKY Fund II Phoenix III, LLC, and YourPeople, Inc. d/b/a Zenefits FTW Insurance Services shall appear at an Order to Show Cause hearing on Wednesday, September 21, 2016 at 1:30 p.m. before **Judge Karen Mullins, 101 W. Jefferson (East Court Building, Courtroom 814), Phoenix, Arizona 85003,** and show cause

4063889.1
09/09/16

1  why a temporary restraining order and preliminary injunction should not be entered against them
2  as requested by Plaintiff in its Application.

3      **IT IS FURTHER ORDERED** that Plaintiff shall serve upon Defendants all documents
4  that have been filed or presented to the Court in this matter, including this Order, in accordance
5  with Rule 4.1(d) of the Arizona Rules of Civil Procedure **at least three business days prior to**
6  **the hearing date.**

7      This hearing is scheduled for thirty minutes.  The parties shall be prepared to make a
8  brief presentation of their respective positions and to discuss next steps and future scheduling.
9  Evidence will not be taken at the hearing.

10

11  Dated: 9/14/16

12                                              Honorable Dawn M. Bergin
13                                              Superior Court Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

# SUBLEASE

# BETWEEN

# YOURPEOPLE, INC.
## D/B/A ZENEFITS FTW INSURANCE SERVICES

# AND

# AMERIFIRST FINANCIAL, INC.

40 East Rio Salado Parkway
Tempe, Arizona

Seventh (7th) Floor

SUBLEASE

THIS SUBLEASE ("**Sublease**") is entered into as of July _1_ , 2016 (the "**Effective Date**"), by and between **YOURPEOPLE, INC.**, a Delaware corporation d/b/a Zenefits FTW Insurance Services ("**Sublandlord**"), and **AMERIFIRST FINANCIAL, INC.**, an Arizona corporation ("**Subtenant**"), with reference to the following facts:

        A.      Pursuant to that certain Lease dated as of June, 2015, amended by a letter adjusting floors comprising the premises dated as of July 8, 2015 (collectively, the "**Master Lease**"), PKY Fund II Phoenix III, LLC, a Delaware limited liability company ("**Landlord**"), as Landlord, leases to Sublandlord, as tenant thereunder, certain space (the "**Master Lease Premises**") consisting of 135,675 rentable square feet located on the second (2nd), third (3rd), seventh (7th), eighth (8th) and ninth (9th) floors of the building located at 40 E. Rio Salado Parkway in the city of Tempe, Arizona (the "**Building**").

        B.      Subtenant wishes to sublease from Sublandlord, and Sublandlord wishes to sublease to Subtenant, a portion of the Master Lease Premises containing approximately 27,135 rentable square feet located on the seventh (7th) floor of the Building, said space being more particularly identified and described on the floor plan attached hereto as **Exhibit A** and incorporated herein by reference (the "**Subleased Premises**").

        NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged by the parties, Sublandlord and Subtenant hereby agree as follows:

        1.      Sublease. Sublandlord hereby subleases to Subtenant and Subtenant hereby subleases from Sublandlord for the Term (defined below), at the rental, and upon all of the conditions set forth herein, the Subleased Premises.

        2.      Condition Precedent. This Sublease will be binding upon Sublandlord and Subtenant as of the date of mutual execution and delivery of this Sublease. However, anything to the contrary in this Sublease notwithstanding the procurement of, Landlord's consent to this Sublease (the "**Consent**") on or before the date that is sixty (60) days after the date of mutual execution and delivery of this Sublease (the "**Outside Consent Date**") shall be a condition precedent to Sublandlord's obligation to deliver the Subleased Premises to Subtenant and to Subtenant's obligations hereunder (other than Subtenant's obligations, set forth herein, to participate in the procurement of the Consent). The Consent shall be under terms and conditions acceptable to Sublandlord and Subtenant, as determined by Sublandlord and Subtenant in their respective sole and absolute discretion. Sublandlord will be responsible for obtaining the Consent and shall use commercially reasonable efforts to secure the same promptly upon mutual execution of this Sublease; Subtenant will diligently cooperate with such efforts. In the event the Consent has not been fully executed and delivered as of the Outside Consent Date, this Sublease shall terminate without any further action of the Parties. The date upon which the Consent is mutually executed and delivered is hereinafter referred to as the "**Consent Date**".

1

3.     Term.

(a)     Generally.  The term of this Sublease (the "**Term**") shall commence on November 1, 2016 (the "**Commencement Date**") and end on October 15, 2025 (the "**Expiration Date**"), unless sooner terminated pursuant to any provision hereof.

(b)     Early Access.  Provided that Subtenant has delivered to Sublandlord (A) the pre-paid Base Rent required pursuant to Section 3.1(a) below, (B) the Security Deposit and (C) evidence of Subtenant's procurement of all insurance coverage required hereunder, Subtenant and Subtenant's representatives shall have the right to enter the Subleased Premises from and after the date that is one (1) day following the Consent Date (the date upon which Subtenant first has such access to the Subleased Premises being referred to herein as the "**Early Access Date**") for the sole purpose of conducting all work Subtenant deems necessary for the operation of its business from the Subleased Premises, including, without limitation, constructing Subtenant Improvements (defined in Section 15.2 below) therein and installation of Subtenant's personal property and equipment, furniture, fixtures and voice and data cabling, all subject to the terms, conditions and requirements of the Master Lease.  All of the rights and obligations of the parties under this Sublease (other than Subtenant's obligation to pay Base Rent (as defined below) or its share of Operating Costs (as defined below), but expressly including, without limitation, Subtenant's obligation to pay excess utility charges, carry insurance and indemnification obligations) shall commence upon the Early Access Date.  Subtenant shall coordinate such entry with Sublandlord, and such entry shall be made in compliance with all terms and conditions of this Sublease, the Master Lease and the rules and regulations attached to the Master Lease.

4.     Rent.

4.1     Rent Payments.

(a)     Generally.  Subtenant shall pay to Sublandlord as base rent for the Subleased Premises during the Term ("**Base Rent**") the following:

| Period | Rate Per Rentable Square Foot Per Annum | Monthly Base Rent |
|---|---|---|
| November 1, 2016 - October 31, 2017 | $33.00 | $74,621.25* |
| November 1, 2017 - October 31, 2018 | $34.00 | $76,882.50 |
| November 1, 2018 - October 31, 2019 | $35.00 | $79,143.75 |
| November 1, 2019 - October 31, 2020 | $36.00 | $81,405.00 |
| November 1, 2020 - October 31, 2021 | $37.00 | $83,666.25 |
| November 1, 2021 - October 31, 2022 | $38.00 | $85,927.50 |
| November 1, 2022 - October 31, 2023 | $39.00 | $88,188.75 |
| November 1, 2023 - October 31, 2024 | $40.00 | $90,450.00 |
| November 1, 2024 - October 31, 2025 | $41.00 | $92,711.25 |

*Subject to abatement pursuant to Section 3.1(b) below.

Base Rent shall be paid in advance on the first day of each month of the Term, except that Subtenant shall pay one (1) month's Base Rent to Sublandlord upon execution of this Sublease and delivery of this Sublease to Sublandlord; said pre-paid Base Rent will be applied to the first

(1st) month's Base Rent due and payable hereunder following the Abatement Period (as defined below).  If the Term does not begin on the first day of a calendar month or end on the last day of a month, the Base Rent and Additional Rent (hereinafter defined) for any partial month shall be prorated by multiplying the monthly Base Rent and Additional Rent by a fraction, the numerator of which is the number of days of the partial month included in the Term and the denominator of which is the total number of days in the full calendar month.  All Rent (as hereinafter defined) shall be payable in lawful money of the United States, by regular bank check of Subtenant, to Sublandlord at the following address:

> YourPeople, Inc., d/b/a Zenefits
> 303 2nd Street
> San Francisco, California  94107
> Attn:  Scott Clark

or to such other persons or at such other places as Sublandlord may designate in writing.

(b)    Abatement.    Notwithstanding anything in Section 3.1(a) above to the contrary, so long as Subtenant is not in Default (as defined in Section 8 below), Subtenant shall be entitled to an abatement of Base Rent for the first (1st) six (6) full calendar months of the Term (the "**Abatement Period**").  The total amount of Base Rent abated during the Abatement Period, in the amount of $447,727.50, is referred to herein as the "**Abated Rent**".  If Subtenant is in Default at any time during the Term, then (i) if such Default occurs prior to the expiration of the Abatement Period, there will be no further Abatement of Base Rent pursuant to this Section 3.1(b) and (ii) at Sublandlord's option, all then-unamortized Abated Rent (assuming amortization of all Abated Rent on a straight-line basis over the Term) shall immediately become due and payable.  The payment by Subtenant of the Abated Rent in the event of a Default shall not limit or affect any of Sublandlord's other rights, pursuant to this Sublease or at law or in equity.  During the Abatement Period, only Base Rent shall be abated, and all other costs and charges specified in this Sublease shall remain as due and payable pursuant to the provisions of this Sublease.

4.2    Operating Costs.

(a)    Definitions.  For purposes of this Sublease and in addition to the terms defined elsewhere in this Sublease, the following terms shall have the meanings set forth below:

(1)    "**Additional Rent**" shall mean the sums payable pursuant to Section 3.2(b) below.

(2)    "**Base Operating Costs**" shall mean Operating Costs payable by Sublandlord to Landlord for the Master Lease Premises during the Base Year.

(3)    "**Base Year**" shall mean the calendar year 2016.

(4)    "**Operating Costs**" shall mean the aggregate of Operating Expenses and Taxes (as said terms are defined in the Master Lease) charged by Landlord to Sublandlord pursuant to the Master Lease.

3



(5)   **"Rent"** shall mean, collectively, Base Rent, Additional Rent and all other sums payable by Subtenant to Sublandlord under this Sublease, whether or not expressly designated as "rent", all of which are deemed and designated as rent pursuant to the terms of this Sublease.

(6)   **"Subtenant's Percentage Share"** shall mean 20% (i.e., 27,135/135,675).

(b)   <u>Payment of Additional Rent</u>.  Except as otherwise provided below, in addition to the Base Rent payable pursuant to Section 4.1 above, from and after the expiration of the Base Year, for each calendar year of the Term, Subtenant shall pay, as Additional Rent, Subtenant's Percentage Share of the amount by which Operating Costs payable by Sublandlord for the then current calendar year exceed Base Operating Costs.  Sublandlord shall provide Subtenant with written notice of Sublandlord's estimate of the amount of Additional Rent per month payable pursuant to this Section 4.2(b) for each calendar year after the Base Year promptly following the Sublandlord's receipt of Landlord's estimate of the Operating Costs payable under the Master Lease.  Thereafter, the Additional Rent payable pursuant to this Section 4.2(b) shall be determined and adjusted in accordance with the provisions of Section 4.2(c) below.  The foregoing notwithstanding, with regard to Subtenant's Share of any Operating Costs attributable to Taxes (as defined in the Master Lease), Subtenant shall only be responsible for Twenty-Five Percent (25%) of Subtenant's Share of Taxes otherwise payable for the first year Taxes increase over the Taxes for the Base Year (the "**Tax Increase Year**"), Fifty Percent (50%) of Subtenant's Share of Taxes otherwise payable for the year following the Tax Increase Year, and Seventy-Five Percent (75%) of Subtenant's Share of Taxes otherwise payable for the second year following the Tax Increase Year.  The remainder of Subtenant's Share of Operating Costs shall remain as provided herein.

(c)   <u>Procedure</u>.  The determination and adjustment of Additional Rent payable hereunder shall be made in accordance with the following procedures:

(1)   <u>Delivery of Estimate; Payment</u>.  Upon receipt of a statement from Landlord specifying the estimated Operating Costs to be charged to Sublandlord under the Master Lease with respect to each calendar year following the Base Year, or as soon after receipt of such statement as practicable, Sublandlord shall give Subtenant written notice of its estimate of Additional Rent payable under Section 4.2(b) for the ensuing calendar year, which estimate shall be prepared based on the estimate received from Landlord (as Landlord's estimate may change from time to time), together with a copy of the statement received from Landlord.  On or before the first day of each month during each calendar year, Subtenant shall pay to Sublandlord as Additional Rent one-twelfth (1/12th) of such estimated amount together with the Base Rent.

(2)   <u>Sublandlord's Failure to Deliver Estimate</u>.  In the event Sublandlord's notice set forth in Subsection 4.2(c)(1) is not given on or before December of the calendar year preceding the calendar year for which Sublandlord's notice is applicable, as the case may be, then until the calendar month after such notice is delivered by Sublandlord, Subtenant shall continue to pay to Sublandlord monthly, during the ensuing calendar year, estimated payments equal to the amounts payable hereunder during the calendar year just ended.  Upon receipt of any such post-December notice Subtenant shall (i) commence as of the immediately following calendar month, and continue for the remainder of the calendar year, to pay to

4



Sublandlord monthly such new estimated payments and (ii) if the monthly installment of the new estimate of such Additional Rent is greater than the monthly installment of the estimate for the previous calendar year, pay to Sublandlord within thirty (30) days of the receipt of such notice an amount equal to the difference of such monthly installment multiplied by the number of full and partial calendar months of such year preceding the delivery of such notice.

(d)     Year End Reconciliation.     Following the receipt by Sublandlord of a final Expense Statement (defined in the Master Lease) from Landlord with respect to each calendar year, Sublandlord shall deliver to Subtenant a statement of the adjustment to be made pursuant to Section 4.2 above for the calendar year just ended, together with a copy of any corresponding Expense Statement received by Sublandlord from Landlord. If on the basis of such statement Subtenant owes an amount that is less than the estimated payments actually made by Subtenant for the calendar year just ended, Sublandlord shall credit such excess to the next payments of Rent coming due or, if the term of this Sublease is about to expire, promptly refund such excess to Subtenant. If on the basis of such statement Subtenant owes an amount that is more than the estimated payments for the calendar year just ended previously made by Subtenant, Subtenant shall pay the deficiency to Sublandlord within thirty (30) days after delivery of the statement from Sublandlord to Subtenant.

(e)     Reliance on Landlord's Calculations.     In calculating Operating Costs payable hereunder by Subtenant, Sublandlord shall have the right to rely upon the calculations of Landlord made in determining Operating Expenses and Taxes pursuant to the provisions of the Master Lease and Subtenant shall have no direct right to audit or review Landlord's calculation of Operating Expenses or Taxes.

(f)     Survival.     The expiration or earlier termination of this Sublease shall not affect the obligations of Sublandlord and Subtenant pursuant to Subsection 3.2(d), and such obligations shall survive, remain to be performed after, any expiration or earlier termination of this Sublease.

5.     Security Deposit.

5.1     Concurrently with Subtenant's execution of this Sublease, Subtenant shall deposit with Sublandlord the sum of $74,621.25 (the "**Security Deposit**"). The Security Deposit shall be held by Sublandlord as security for the faithful performance by Subtenant of all the provisions of this Sublease to be performed or observed by Subtenant. If Subtenant fails to pay rent or other sums due hereunder, or otherwise is in breach with respect to any provisions of this Sublease, Sublandlord may use, apply or retain all or any portion of the Security Deposit for the payment of any rent or other past-due sum or for the payment of any other sum to which Sublandlord may become obligated by reason of Subtenant's breach, or to compensate Sublandlord for any loss or damage which Sublandlord may suffer thereby. If Sublandlord so uses or applies all or any portion of the Security Deposit, Subtenant shall within ten (10) days after written demand therefor deposit cash with Sublandlord in an amount sufficient to restore the Security Deposit to the full amount thereof and Subtenant's failure to do so shall be a material Default without the necessity of the passage of any additional cure period. If Subtenant performs all of Subtenant's obligations hereunder, the Security Deposit, or so much thereof as has not theretofore been applied by Sublandlord, shall be returned, without interest, to Subtenant (or, at Sublandlord's option, to the last assignee, if any, of Subtenant's interest hereunder) within forty five (45) days following

the later to occur of (x) the expiration of the Term and Subtenant's vacation from the Subleased Premises and fulfillment of all repair and restoration obligations hereunder; in addition to any other deductions Sublandlord is entitled to make pursuant to the terms hereof, Sublandlord shall have the right to make a good faith estimate of any unreconciled Operating Costs as of the date of expiration and to deduct any anticipated shortfall from the Security Deposit.  No trust relationship is created herein between Sublandlord and Subtenant with respect to the Security Deposit. Sublandlord shall not be required to keep the Security Deposit separate from its other accounts.

> 5.2    Letter of Credit.

> (a)    Generally.  Simultaneously with the execution of this Lease, in lieu of the cash Security Deposit described in the preceding paragraph (5.1), Subtenant may elect to deliver to Sublandlord an unconditional, irrevocable, transferable letter of credit ("**Letter of Credit**") in the amount of the Security Deposit required thereunder as security.

> (b)    The Letter of Credit will be subject to the following terms and conditions.

> (1)    the Letter of Credit will be in the form attached hereto as **Exhibit B**;

> (2)    the Letter of Credit will at all times in the amount of the Security Deposit, and if at any time and for any reason the amount able to be drawn by Sublandlord under the Letter of Credit is less than the amount of the Security Deposit, Subtenant shall, within ten (10) business days thereafter, cause the amount able to be drawn by Sublandlord to be increased to the amount of the Security Deposit;

> (3)    the Letter of Credit will be issued by a commercial bank reasonably acceptable to Sublandlord (Sublandlord hereby approves Chase as the issuing bank);

> (4)    the Letter of Credit will be transferable at no charge by Sublandlord (i.e., Subtenant will bear any transfer fees) to any successor to Sublandlord's interest under the Sublease, or its mortgagee, or agent of either;

> (5)    the Letter of Credit will be payable at sight upon presentment to the issuer of a Sight Draft from Sublandlord in the form attached hereto as part of **Exhibit B**;

> (6)    the Letter of Credit will not expire sooner than one (1) year from issuance; and

> (7)    at least thirty (30) days prior to the then current expiration date of the Letter of Credit, the Letter of Credit will shall be replaced, renewed, or automatically extended from time to time through the 120th day after the expiration of the Term.

> (c)    Drawing Under Letter of Credit.  Without prejudice to any other remedy available to Sublandlord under this Sublease or at law, Sublandlord may draw upon the initial Letter of Credit or any replacement Letter of Credit on or after the occurrence of either:

6

(i) any Default; (ii) any failure by Subtenant to deliver to Sublandlord a replacement Letter of Credit as and when required pursuant to this Section 5.2; (iii) an uncured failure by Subtenant to perform one or more of its obligations under this Sublease and the existence of circumstances in which Sublandlord is enjoined or otherwise prevented by operation of law from giving to Subtenant a written notice which would be necessary for such failure of performance to constitute an event of default, or (iv) the appointment of a receiver to take possession of all or substantially all of the assets of Subtenant, or an assignment of Subtenant for the benefit of creditors, or any action taken or suffered by Subtenant under any insolvency, bankruptcy, reorganization or other debtor relief proceedings, whether now existing or hereafter amended or enacted; provided that in the event of (i) or (iii), Sublandlord may, at Sublandlord's sole option, draw upon a portion of the face amount of the Letter of Credit, as required to compensate Sublandlord for damages incurred (with subsequent demands at Sublandlord's sole election as Sublandlord incurs further damage). Subtenant will not interfere in any way with payment to Sublandlord of the proceeds of the Letter of Credit, either prior to or following a draw by Sublandlord of any portion of the Letter of Credit, regardless of whether any dispute exists between Subtenant and Sublandlord as to Sublandlord 's right to draw upon the Letter of Credit. No condition or term of this Sublease shall be deemed to render the Letter of Credit conditional to justify the issuer of the Letter of Credit in failing to honor a drawing upon such Letter of Credit in a timely manner.

(d)     Transfer. If the beneficiary of the Letter of Credit transfers the Letter of Credit, the transferor shall be released from all liability for the return thereof. If the Letter of Credit is not replaced or renewed within the time period specified in Section 5.2((b)(7) above, then Sublandlord shall have the right to immediately draw upon the entire amount of the Letter of Credit. Any amounts so drawn under the Letter of Credit shall be held by Sublandlord as cash Security Deposit pursuant to Section 5.1.

(e)     Credit Rating. Each Letter of Credit shall be issued by a commercial bank that has a long term credit rating of at least A (or equivalent) by Moody's Investor Service, Inc., or Standard & Poor's Corporation or Fitch Inc. (a "**Satisfactory Credit Rating**"), and shall be otherwise acceptable to Sublandlord in its reasonable discretion. If the issuer's credit rating is or subsequently falls below a Satisfactory Credit Rating, then Sublandlord shall have the right to require that Subtenant obtain from a different issuer a substitute Letter of Credit that complies in all respects with the requirements of this Section 5, and Subtenant's failure to obtain such substitute Letter of Credit within ten (10) business days following Sublandlord's written demand therefor shall entitle Sublandlord to immediately draw upon the then existing Letter of Credit and hold such proceeds as provided above. In the event the issuer of any Letter of Credit is placed into receivership or conservatorship by the Federal Deposit Insurance Corporation, or any successor or similar entity, then, effective as of the date such receivership or conservatorship occurs, said Letter of Credit shall be deemed to not meet the requirements of this Section 5, and, within ten (10) business days thereafter, Subtenant shall replace such Letter of Credit with cash equal to the Security Deposit or other collateral acceptable to Sublandlord in its reasonable discretion.

6.     Use and Occupancy.

6.1     Use. The Subleased Premises shall be used and occupied only for general office use, and for no other use or purpose.

6.2     Subtenant's Compliance with Master Lease.  Subtenant will occupy the Subleased Premises in accordance with the terms of the Master Lease and will not suffer to be done, or omit to do, any act which may result in a violation of or a default under the Master Lease, or render Sublandlord liable for any damage, charge or expense thereunder.  Subtenant will indemnify, defend protect and hold Sublandlord harmless from and against any loss, cost, damage or liability (including attorneys' fees) of any kind or nature arising out of, by reason of, or resulting from, Subtenant's failure to perform or observe any of the terms and conditions of the Master Lease or this Sublease.  Any other provision in this Sublease to the contrary notwithstanding, Subtenant shall pay to Sublandlord as Rent hereunder any and all sums which Sublandlord may be required to pay the Landlord arising out of a request by Subtenant for, or the use by Subtenant of, additional or over-standard Building services from Landlord (for example, but not by way of limitation, charges associated with after-hour HVAC usage and overstandard electrical charges).

6.3     Sublandlord's Compliance with Master Lease.  Sublandlord will not suffer to be done, or omit to do, any act which may result in a violation of or a Default (as defined in the Master Lease) under the Master Lease, or render Subtenant liable for any damage, charge or expense thereunder.  Sublandlord will indemnify, defend protect and hold Subtenant harmless from and against any loss, cost, damage or liability (including attorneys' fees) of any kind or nature arising out of, by reason of, or resulting from, Sublandlord's breach of the terms and conditions of the Master Lease (provided the same is not attributable to the acts or omissions of Subtenant) or this Sublease.

6.4     Landlord's Obligations.  Subtenant agrees that Sublandlord shall not be required to perform any of the covenants, agreements and/or obligations of Landlord under the Master Lease, including, without limitation, the services provided by Landlord pursuant to the Master Lease, and, insofar as any of the covenants, agreements and obligations of Sublandlord hereunder are required to be performed under the Master Lease by Landlord thereunder, Subtenant acknowledges and agrees that Sublandlord shall be entitled to look to Landlord for such performance.  In addition, Sublandlord shall have no obligation to perform any repairs or any other obligation of Landlord under the Master Lease, nor shall any representations or warranties made by Landlord under the Master Lease be deemed to have been made by Sublandlord.  Sublandlord shall not be responsible for any failure or interruption, for any reason whatsoever, of the services or facilities that may be appurtenant to or supplied at the Building by Landlord or otherwise, including, without limitation, heat, air conditioning, ventilation, life-safety, water, electricity, elevator service and cleaning service, if any; and no failure to furnish, or interruption of, any such services or facilities shall give rise to any (i) abatement, diminution or reduction of Subtenant's obligations under this Sublease, or (ii) liability on the part of Sublandlord.  Notwithstanding the foregoing, Sublandlord shall use good faith efforts, under the circumstances, to secure such performance upon Subtenant's request to Sublandlord to do so and shall thereafter diligently prosecute such performance on the part of Landlord; provided, however, that this sentence will not be construed to require that Sublandlord commence any action against Landlord.

7.      Master Lease and Sublease Terms.

7.1     Subject to Master Lease.  This Sublease is and shall be at all times subject and subordinate to the Master Lease.  Subtenant acknowledges that Subtenant has reviewed and is familiar with all of the terms, agreements, covenants and conditions of the Master Lease.  Additionally, Subtenant's rights under this Sublease shall be subject to the terms of the Consent.

8

During the Term and for all periods subsequent thereto with respect to obligations which have arisen prior to the termination of this Sublease, Subtenant agrees to perform and comply with, for the benefit of Sublandlord and Landlord, the obligations of Sublandlord under the Master Lease which pertain to the Subleased Premises and/or this Sublease, except for those provisions of the Master Lease which are directly contradicted by this Sublease, in which event the terms of this Sublease document shall control over the Master Lease.

   7.2 <u>Incorporation of Terms of Master Lease</u>. The terms, conditions and respective obligations of Sublandlord and Subtenant to each other under this Sublease shall be the terms and conditions of the Master Lease, except for those provisions of the Master Lease which are directly contradicted by this Sublease, in which event the terms of this Sublease shall control over the Master Lease. Therefore, for the purposes of this Sublease, wherever in the Master Lease the word "Landlord" is used it shall be deemed to mean Sublandlord and wherever in the Master Lease the word "Tenant" is used it shall be deemed to mean Subtenant. Additionally, wherever in the Master Lease the word "Premises" is used it shall be deemed to mean the Subleased Premises. Any non-liability, release, indemnity or hold harmless provision in the Master Lease for the benefit of Landlord that is incorporated herein by reference, shall be deemed to inure to the benefit of Sublandlord, Landlord, and any other person intended to be benefited by said provision, for the purpose of incorporation by reference in this Sublease. Any right of Landlord under the Master Lease (a) of access or inspection, (b) to do work in the Master Lease Premises or in the Building, (c) in respect of rules and regulations, which is incorporated herein by reference, shall be deemed to inure to the benefit of Sublandlord, Landlord, and any other person intended to be benefited by said provision, for the purpose of incorporation by reference in this Sublease.

   7.3 <u>Modifications</u>. For the purposes of incorporation herein, the terms of the Master Lease are subject to the following additional modifications:

     (a) <u>Approvals</u>. In all provisions of the Master Lease (under the terms thereof and without regard to modifications thereof for purposes of incorporation into this Sublease) requiring the approval or consent of Landlord, Subtenant shall be required to obtain the approval or consent of both Sublandlord and Landlord.

     (b) <u>Deliveries</u>. In all provisions of the Master Lease requiring Tenant to submit, exhibit to, supply or provide Landlord with evidence, certificates, or any other matter or thing, Subtenant shall be required to submit, exhibit to, supply or provide, as the case may be, the same to both Landlord and Sublandlord.

     (c) <u>Damage; Condemnation</u>. Sublandlord shall have no obligation to restore or rebuild any portion of the Subleased Premises after any destruction or taking by eminent domain. Any rights of Subtenant to abatement of rent shall be conditioned upon Sublandlord's ability to abate rent for the Subleased Premises under the terms of the Master Lease.

     (d) <u>Insurance</u>. In all provisions of the Master Lease requiring Tenant to designate Landlord as an additional or named insured on its insurance policy, Subtenant shall be required to so designate Landlord and Sublandlord on its insurance policy. Sublandlord shall have no obligation to maintain the insurance to be maintained by Landlord under the Master Lease.

9



7.4     Exclusions.   Notwithstanding the terms of Section 7.2 above, Subtenant shall have no rights nor obligations under the following parts, Sections and Exhibits of the Master Lease: Article 1 (except Sections 1(r), 1(s), 1(x), 1(u), 1(v) and 1(w)), Sections 2(a), 2(b) (except definitions of "Development Agreement" and "Prime Lease"), Sections 3(b), 3(e) (Subtenant expressly acknowledging that it will have no right to bring dogs into the Subleased Premises or the Building), Article 4, Article 5 (except third (3rd) sentence and the definition of "Rent"), Article 6 (except the definition of "Additional Rent"), Article 7 (except to the extent necessary to implement Section 4.2 above), Article 8, Article 9, Article 16 (provisions regarding "Second Request", and deemed consent and limitation of removal obligations to "Specialty Alterations" only), Article 21 (it being acknowledged that Sublandlord will not be required to maintain the insurance coverage required of Landlord as described in said Article 21, but that this exclusion will not be deemed to excuse Landlord from complying with its obligations under said Article 21), Article 29, Section 30(b), Article 34, Section 38(d) (provisions regarding deemed consent only), Articles 43 (references to "Building Top Signage", lobby/suite entry signage and "Competitors" only), 45, 48, 49, 50, 53 (provisions allowing the recording of a memorandum only), Exhibit D, Exhibit E, Exhibit G, Exhibit I and Exhibit J.

8.     Assignment and Subletting.   Subtenant may assign this Sublease or further sublet all or any part of the Subleased Premises in accordance with all of the terms and conditions of the Master Lease, and Sublandlord (in addition to Landlord) shall have the same rights with respect to assignment and subleasing as Landlord has under the Master Lease.   Subtenant shall pay all fees and costs payable to Landlord pursuant to the Master Lease in connection with any proposed assignment, sublease or transfer of the Subleased Premises, together with all of Sublandlord's reasonable out-of-pocket costs relating to Subtenant's request for such consent, regardless of whether such consent is granted, and the effectiveness of any such consent shall be conditioned upon Landlord's and Sublandlord's receipt of all such fees and costs.

9.     Default.

(a)     By Subtenant.   Except as expressly set forth herein, Subtenant shall perform all obligations in respect of the Subleased Premises that Sublandlord would be required to perform pursuant to the Master Lease with respect to the Subleased Premises. It shall constitute a "**Default**" hereunder if Subtenant fails to perform any obligation hereunder (including, without limitation, the obligation to pay Rent), or any obligation under the Master Lease which has been incorporated herein by reference, and, in each instance, Subtenant has not remedied such failure (i) in the case of any monetary Default, three (3) business days after delivery of written notice from Sublandlord and (ii) in the case of any other Default, ten (10) calendar days after delivery of written notice from Sublandlord; provided, however, that if the Default is of a nature such that it is incapable of cure within ten (10) calendar days, then for so long as Sublandlord has not received notice from Landlord stating that Landlord will treat such Default as a "Default" under the Master Lease, Subtenant shall not be in Default hereunder if Subtenant commences the cure within the ten (10) calendar day period and thereafter diligently prosecutes the cure to completion; however, if at any time Sublandlord receives notice from Landlord that the Default will be treated as a "Default" under the Master Lease, Subtenant's cure period will immediately be deemed to expire ten (10) days before the date of expiration of Sublandlord's cure period as set forth in Landlord's notice of default to Sublandlord.

(b)      By Sublandlord.  It shall be considered a "**Default**" of Sublandlord hereunder if Sublandlord fails to satisfy any of its obligations under this Sublease or under the Master Lease and such failure continues for ten (10) calendar days after delivery of written notice from Subtenant, or if Default is of a nature that is incapable of cure within ten (10) calendar days, within such time as is reasonably necessary for Sublandlord to affect such cure provided Sublandlord commences such cure within such ten (10) calendar days and thereafter diligently proceeds to completion.

10.      Remedies.  In the event of any Default hereunder by Subtenant, Sublandlord shall have all remedies provided to the "Landlord" in the Master Lease as if a default had occurred thereunder and all other rights and remedies otherwise available at law and in equity.  Sublandlord may resort to its remedies cumulatively or in the alternative.  In the event of any Default hereunder by Sublandlord, Subtenant shall have all the remedies provided to the Sublandlord as "tenant" under the Master Lease as well as all remedies provided in this Sublease and all other rights and remedies otherwise available at law and in equity.   Subtenant may resort to its remedies cumulatively or in the alternative.

11.      Right to Cure Defaults.  If Subtenant fails to perform any of its obligations under this Sublease after expiration of applicable grace or cure periods, then Sublandlord may, but shall not be obligated to, perform any such obligations for Subtenant's account.  All costs and expenses incurred by Sublandlord in performing any such act for the account of Subtenant shall be deemed Rent payable by Subtenant to Sublandlord upon demand, together with interest thereon at the lesser of (i) twelve percent (12%) per annum or (ii) the maximum rate allowable under law from the date of the expenditure until repaid.  If Sublandlord undertakes to perform any of Subtenant's obligations for the account of Subtenant pursuant hereto, the taking of such action shall not constitute a waiver of any of Sublandlord's remedies. Subtenant hereby expressly waives its rights under any statute to make repairs at the expense of Sublandlord.

12.      Consents and Approvals.  In any instance when Sublandlord's consent or approval is required under this Sublease, Sublandlord's refusal to consent to or approve any matter or thing shall be deemed reasonable if, among other matters, such consent or approval is required under the provisions of the Master Lease incorporated herein by reference but has not been obtained from Landlord. Except as otherwise provided herein, Sublandlord shall not unreasonably withhold, or delay its consent to or approval of a matter if such consent or approval is required under the provisions of the Master Lease and Landlord has consented to or approved of such matter.

13.      Sublandlord's Liability.

13.1      Limitation of Liability.   Notwithstanding any other term or provision of this Sublease, the liability of Sublandlord to Subtenant for any default in Sublandlord's obligations under this Sublease shall be limited to actual, direct damages, and under no circumstances shall Subtenant, its partners, members, shareholders, directors, agents, officers, employees, contractors, sublessees, successors and/or assigns be entitled to recover from Sublandlord (or otherwise be indemnified by Sublandlord) for (a) any losses, costs, claims, causes of action, damages or other liability incurred in connection with a failure of Landlord, its partners, members, shareholders, directors, agents, officers, employees, contractors, successors and /or assigns to perform or cause to be performed Landlord's obligations under the Master Lease, (b)

11

lost revenues, lost profit or other consequential, special or punitive damages arising in connection with this Sublease for any reason, or (c) any damages or other liability arising from or incurred in connection with the condition of the Subleased Premises or suitability of the Subleased Premises for Subtenant's intended uses. Subtenant shall, however, have the right to seek any injunctive or other equitable remedies as may be available to Subtenant under applicable law. Notwithstanding any other term or provision of this Sublease, no personal liability shall at any time be asserted or enforceable against Sublandlord's shareholders, directors, officers, or partners on account of any of Sublandlord's obligations or actions under this Sublease. As used in this Sublease, the term "Sublandlord" means the holder of the tenant's interest under the Master Lease and the holder of sublandlord's interest under this Sublease. In the event of any assignment or transfer of the Sublandlord's interest under this Sublease, which assignment or transfer may occur at any time during the Term in Sublandlord's sole discretion, Sublandlord shall be and hereby is entirely relieved of all covenants and obligations of Sublandlord hereunder accruing subsequent to the date of the assignment or transfer and it shall be deemed and construed, without further agreement between the parties hereto, that any transferee has assumed and shall carry out all covenants and obligations thereafter to be performed by Sublandlord hereunder. Sublandlord may transfer and deliver any then-existing Security Deposit to the transferee of Sublandlord's interest under this Sublease, and thereupon Sublandlord shall be discharged from any further liability with respect thereto.

       13.2   <u>Sublandlord Default</u>. Sublandlord shall be in default hereunder only if Sublandlord has not commenced and pursued with reasonable diligence the cure of any failure of Sublandlord to meet its obligations hereunder within thirty (30) days after the receipt by Sublandlord of written notice from Subtenant.

       14.   <u>Attorneys' Fees</u>. If Sublandlord or Subtenant brings an action to enforce the terms hereof or to declare rights hereunder, the prevailing party who recovers substantially all of the damages, equitable relief or other remedy sought in any such action on trial and appeal shall be entitled to receive from the other party its costs associated therewith, including, without limitation, reasonable attorney's fees and costs from the other party. Without limiting the generality of the foregoing, if Sublandlord utilizes the services of an attorney for the purpose of collecting any Rent due and unpaid by Subtenant or in connection with any other breach of this Sublease by Subtenant, Subtenant agrees to pay Sublandlord reasonable actual attorneys' fees as determined by Sublandlord for such services, irrespective of whether any legal action may be commenced or filed by Sublandlord. If any such work is performed by in-house counsel for Sublandlord, the value of such work shall be determined at a reasonable hourly rate for comparable outside counsel.

       15.   <u>Delivery of Possession</u>.

       15.1   <u>Generally</u>. Sublandlord shall deliver, and Subtenant shall accept, possession of the Subleased Premises in their "AS IS" condition as the Subleased Premises exists on the date hereof. Sublandlord shall have no obligation to furnish, render or supply any work, labor, services, materials, furniture (other than the FF&E, as defined below), fixtures, equipment, decorations or other items to make the Subleased Premises ready or suitable for Subtenant's occupancy. In making and executing this Sublease, Subtenant has relied solely on such investigations, examinations and inspections as Subtenant has chosen to make or has made and has not relied on any representation or warranty concerning the Subleased Premises or the

12

Building, except as expressly set forth in this Sublease.  Subtenant acknowledges that Sublandlord has afforded Subtenant the opportunity for full and complete investigations, examinations and inspections of the Subleased Premises and the common areas of the Building.  Subtenant acknowledges that it is not authorized to make or do any alterations or improvements in or to the Subleased Premises except as permitted by the provisions of this Sublease and the Master Lease and that upon termination of this Sublease, Subtenant shall deliver the Subleased Premises to Sublandlord in the same condition as the Subleased Premises were at the commencement of the Term, reasonable wear and tear excepted; Subtenant acknowledges that Subtenant shall, at either Sublandlord's or Landlord's election remove from the Subleased Premises some or all of the Subtenant Improvements (defined below) constructed therein by Subtenant; additionally, at Subtenant's cost, Subtenant will remove all telecommunications and data cabling installed by or for the benefit of Subtenant.

15.2   Subtenant Improvements.

(a)   Generally.  If Subtenant desires to construct improvements within the Subleased Premises ("**Subtenant Improvements**"), all Subtenant Improvements shall be carried out in accordance with the applicable provisions of the Master Lease.  Sublandlord will have the right to approve the plans and specifications for any proposed Subtenant Improvements, as well as any contractors whom Subtenant proposes to retain to perform such work and the right to require that any Subtenant Improvements be removed by Subtenant (and the relevant area repaired/restored to Sublandlord's reasonable satisfaction) prior to the Expiration Date.  Subtenant will submit all such information for Sublandlord's review and written approval prior to commencement of any such work; Sublandlord will similarly submit such plans to Landlord for review and approval.  Promptly following the completion of any Subtenant Improvements or subsequent alterations or additions by or on behalf of Subtenant, Subtenant will deliver to Sublandlord a reproducible copy of "as built" drawings of such work together with a CAD file of the "as-built" drawings in the then-current version of AutoCad.

(b)   Code-Required Work.  If the performance of any Subtenant Improvements or other work by Subtenant within the Subleased Premises "triggers" a requirement for code-related upgrades to or improvements of any portion of the Building, Subtenant shall be responsible for the cost of such code-required upgrade or improvements.

16.   Holding Over.  If Subtenant fails to surrender the Subleased Premises at the expiration or earlier termination of this Sublease, occupancy of the Subleased Premises after the termination or expiration shall be that of a tenancy at sufferance.  Subtenant's occupancy of the Subleased Premises during the holdover shall be subject to all the terms and provisions of this Sublease and Subtenant shall pay an amount (on a per month basis without reduction for partial months during the holdover) equal to 150% of the sum of the Base Rent and Additional Rent due for the period immediately preceding the holdover.  No holdover by Subtenant or payment by Subtenant after the expiration or early termination of this Sublease shall be construed to extend the Term or prevent Sublandlord from immediate recovery of possession of the Subleased Premises by summary proceedings or otherwise.  In addition to the payment of the amounts provided above, if Sublandlord is unable to deliver possession of the Subleased Premises to a new subtenant or to Landlord, as the case may be, or to perform improvements for a new subtenant, as a result of Subtenant's holdover, Subtenant shall be liable to Sublandlord for all damages, including, without limitation, consequential damages, that Sublandlord suffers from the holdover;

13

Subtenant expressly acknowledges that such damages may include all of the holdover rent charged by Landlord under the Master Lease as a result of Subtenant's holdover, which Master Lease holdover rent may apply to the entire Master Lease Premises.

        17.   <u>Parking</u>.  During the Term and subject to the prior written consent of Landlord, Subtenant shall be permitted to use no less than One Hundred and Twenty (120) of the parking spaces allocated to Sublandlord in the Master Lease.  Subtenant shall pay any monthly parking rental for any such parking spaces as Additional Rent hereunder, and the same amount that Sublandlord is obligated to pay Landlord pursuant to the provisions of Section 1(o) and Article 48 of the Master Lease.

        18.   <u>Signage</u>.  Sublandlord will reasonably cooperate with Subtenant in facilitating Landlord's consent to the installation of Building-standard signage identifying Subtenant in the seventh (7th) floor elevator lobby and in the Building lobby directory located in the ground floor lobby of the Building, all at Subtenant's sole cost and expense.  Subtenant shall remove all such signage and repair any damage caused by the installation and/or removal of such signage to Sublandlord's reasonable satisfaction prior to the expiration or sooner termination of this Sublease.

        19.   <u>Notices</u>: Any notice by either party to the other required, permitted or provided for herein shall be valid only if in writing and shall be deemed to be duly given only if (a) delivered personally, or (b) sent by means of Federal Express, UPS Next Day Air or another reputable express mail delivery service guaranteeing next day delivery, or (c) sent by United States certified or registered mail, return receipt requested, addressed: (i) if to Sublandlord, at the following addresses:

                                YourPeople, Inc., d/b/a Zenefits
                                303 2nd Street
                                San Francisco, California 94107
                                Attn:   Legal Department

with a copy to:

                                YourPeople, Inc., d/b/a Zenefits
                                40 E. Rio Salado Parkway, 9th Floor
                                Tempe, Arizona  85281
                                Attn:   Emily Agin

09600\004\7735681.V8



and (ii) if to Subtenant, at the following address:

and (ii) if to Subtenant, at the following address:

                Prior to the Commencement Date:

                Amerifirst Financial, Inc.
                1550 E. McKellips Road
                Suite 117
                Mesa, Arizona 85023
                Attn:  Germán A. Salazar

                From and after the Commencement Date:

                Amerifirst Financial, Inc.
                40 E. Rio Salado Parkway, 7th  Floor
                Tempe, Arizona 85281
                Attn:  Germán A. Salazar

or at such other address for either party as that party may designate by notice to the other.  A notice shall be deemed given and effective, if delivered personally, upon hand delivery thereof (unless such delivery takes place after hours or on a holiday or weekend, in which event the notice shall be deemed given on the next succeeding business day), if sent via overnight courier, on the business day next succeeding delivery to the courier, and if mailed by United States certified or registered mail, three (3) business days following such mailing in accordance with this Section.

        20.     FF&E.

        20.1    Excess FF&E.  Within ten (10) business days after the Early Access Date, Subtenant shall provide Sublandlord with written notice (the "**FF&E Notice**") of any furniture and equipment currently in the Subleased Premises that Subtenant will desire to have removed therefrom (the "**Excess FF&E**").  Sublandlord shall remove the Excess FF&E from the Subleased Premises within thirty (30) days after the receipt of Subtenant's FF&E Notice.

        20.2    FF&E.  During the Term, at no charge to Subtenant, Subtenant shall be permitted to use the remaining existing FF&E, including, without limitation, modular and office furniture, computer equipment and videoconferencing equipment located in the Subleased Premises and described in more particular detail in **Exhibit C** attached hereto, as well as all equipment and data cabling associated therewith (collectively, the "**FF&E**").  Subtenant shall accept the FF&E in its current condition without any warranty of fitness from Sublandlord (Subtenant expressly acknowledges that no warranty is made by Sublandlord with respect to the condition of any cabling currently located in or serving the Subleased Premises).  For purposes of documenting the current condition of the FF&E, Subtenant and Sublandlord shall, prior to the Commencement Date, conduct a joint walk-through of the Subleased Premises in order to inventory items of damage or disrepair.  Subtenant shall use the FF&E only for the purposes for which such FF&E is intended and shall be responsible for the proper maintenance, insurance, care and repair of the FF&E, at Subtenant's sole cost and expense, using maintenance contractors

specified by Sublandlord.  Subtenant shall not modify or reconfigure any of the FF&E except with the advance written permission of Sublandlord, and any work of modifying any FF&E (including, without limitation, changing the configuration of, "breaking down" or reassembly of cubicles or other modular furniture) shall be performed at Subtenant's sole cost using Sublandlord's specified vendors or an alternate vendor approved in writing by Sublandlord (such approval to be granted or withheld on Sublandlord's good faith discretion, based upon Sublandlord's assessment of factors which include, without limitation, whether the performance by such vendor will void applicable warranties for such FF&E and whether such vendor is sufficiently experienced in the design of such FF&E).  No item of FF&E shall be removed from the Subleased Premises without Sublandlord's prior written consent. The FF&E shall at all times be free of all liens, claims and encumbrances created by Sublandlord.   Sublandlord shall execute all documents Subtenant reasonably deems necessary to perfect and/or place third parties on notice of Subtenant's rights and interest in and to the FF&E.

       20.3   <u>Automatic Transfer of FF&E to Subtenant</u>.  In consideration of Subtenant's performance of its obligations under this Sublease, as of the date that is thirty (30) days prior to the Expiration Date (the "**FF&E Transfer Date**"), all of Sublandlord's right, title and interest in and to the FF&E shall automatically be transferred to Subtenant.  The FF&E shall be so transferred to Subtenant on an "as is" basis with no representation or warranty of any kind from, and no recourse against, Sublandlord; provided, however, that Sublandlord represents and warrants as of the FF&E Transfer Date that it owns all of the FF&E free and clear of all liens and encumbrances and has the authority to so transfer the FF&E.  Thereafter, Subtenant shall be solely responsible for the proper removal of the FF&E from the Subleased Premises and the Building in accordance with the terms and provisions of the Master Lease.  Sublandlord and Subtenant confirm that the transfer of ownership of the FF&E shall occur automatically on the FF&E Transfer Date and that this Sublease shall constitute a bill of sale evidencing the transfer of the FF&E on the FF&E Transfer Date unless otherwise agreed to in a writing signed by both Sublandlord and Subtenant. Notwithstanding the foregoing provisions of this Section to the contrary, if prior to the FF&E Transfer Date Subtenant is in Default hereunder, then at Sublandlord's election, the automatic transfer of all of Sublandlord's right, title and interest in and to the FF&E shall be voidable by Sublandlord.  If Sublandlord so elects to void such transfer, then Sublandlord shall provide notice of such election to Subtenant.  In such event, (i) prior to or promptly following the expiration or earlier termination of the Sublease, Sublandlord shall conduct a walk-through of the Subleased Premises to catalog any items of damage, disrepair, misuse or loss among the FF&E (reasonable wear and tear excepted), and (ii) Subtenant shall be responsible, at Subtenant's sole cost and expense, for curing any such items (including, with respect to loss, replacing any lost item with a substantially similar new item reasonably acceptable to Sublandlord).

       21.   <u>Brokers</u>.  Subtenant represents that it has dealt directly with and only with Avocat Group ("**Subtenant's Broker**"), as a broker in connection with this Sublease. Sublandlord represents that it has dealt directly with and only with Custom Spaces Commercial Real Estate, Inc. ("**Sublandlord's Broker**"), as a broker in connection with this Sublease.  Sublandlord and Subtenant shall indemnify and hold each other harmless from all claims of any brokers other than Subtenant's Broker and Sublandlord's Broker claiming to have represented Sublandlord or Subtenant in connection with this Sublease.  Subtenant and Sublandlord agree that Subtenant's Broker and Sublandlord's Broker shall be paid commissions by Sublandlord in connection with this Sublease pursuant to a separate agreement.

16



22.   <u>Complete Agreement</u>.   There are no representations, warranties, agreements, arrangements or understandings, oral or written, between the parties or their representatives relating to the subject matter of this Sublease which are not fully expressed in this Sublease.  This Sublease cannot be changed or terminated nor may any of its provisions be waived orally or in any manner other than by a written agreement executed by both parties.

23.   <u>Interpretation</u>.  Irrespective of the place of execution or performance, this Sublease shall be governed by and construed in accordance with the laws of the State of Arizona. If any provision of this Sublease or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Sublease and the application of that provision to other persons or circumstances shall not be affected but rather shall be enforced to the extent permitted by law.  The table of contents, captions, headings and titles, if any, in this Sublease are solely for convenience of reference and shall not affect its interpretation. This Sublease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Sublease or any part thereof to be drafted.  If any words or phrases in this Sublease shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Sublease shall be construed as if the words or phrases so stricken out or otherwise eliminated were never included in this Sublease and no implication or inference shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated.  Each covenant, agreement, obligation or other provision of this Sublease shall be deemed and construed as a separate and independent covenant of the party bound by, undertaking or making same, not dependent on any other provision of this Sublease unless otherwise expressly provided.  All terms and words used in this Sublease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.  The word "person" as used in this Sublease shall mean a natural person or persons, a partnership, a corporation or any other form of business or legal association or entity.

24.   <u>USA Patriot Act Disclosures</u>.   Subtenant is currently in compliance with and shall at all times during the Term remain in compliance with the regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto.

25.   <u>Counterparts</u>.  This Sublease may be executed in multiple counterparts, each of which is deemed an original but which together constitute one and the same instrument.  This Sublease shall be fully executed when each party whose signature is required has signed and delivered to each of the parties at least one counterpart, even though no single counterpart contains the signatures of all of the parties hereto. This Sublease may be executed in so-called "pdf" format and each party has the right to rely upon a pdf counterpart of this Sublease signed by the other party to the same extent as if such party had received an original counterpart.

09600\004\7735681.V8

IN WITNESS WHEREOF, the parties hereto hereby execute this Sublease as of the Effective Date.

SUBLANDLORD: YOURPEOPLE, INC.,
a Delaware corporation,
d/b/a Zenefits FTW Insurance
Services

By: _____

Print Name: DAVID SACKS

Title: CEO

SUBTENANT: AMERIFIRST FINANCIAL, INC.,
an Arizona corporation

By: _____

Print Name: Germán A. Salazar

Title: Vice President, General Counsel

18

IN WITNESS WHEREOF, the parties hereto hereby execute this Sublease as of the Effective Date.

SUBLANDLORD:   YOURPEOPLE, INC.,
a Delaware corporation,
d/b/a Zenefits FTW Insurance
Services

By: _____

Print Name: DAVID SACKS

Title: CEO

SUBTENANT:   AMERIFIRST FINANCIAL, INC.,
an Arizona corporation

By: _____

Print Name: Germán A. Salazar

Title: Vice President, General Counsel

## EXHIBIT A

## Subleased Premises



64 Workstations

78 Workstations

36 Workstations

52 Workstations

230 total Workstations

## EXHIBIT B

### Letter of Credit

Irrevocable Standby Letter of Credit No._____

Beneficiary: _____        Issuance Date:

YourPeople, Inc., d/b/a Zenefits
303 2nd Street
San Francisco, California 94107
Attn:   Legal Department

Accountee/Applicant:

_____

Ladies and Gentlemen:

We hereby establish our Irrevocable Letter of Credit no. _____ in your favor for the account of _____ for an amount not to exceed in the aggregate _____ U.S. Dollars ($_____).

Funds under this credit are available against presentation of this original Letter of Credit and the attached **Exhibit A**, with the blanks appropriately completed.

This Letter of Credit expires and is payable at the office of _____ **[Issuing Bank's name, address, department, and fax number]**, on or prior to _____, 20___ **[enter the Expiration Date]**, or any extended date as hereinafter provided for (the "Expiration Date").

If the Expiration Date shall ever fall on a day which is not a business day, then such Expiration Date shall automatically be extended to the date which is the next business day.  It is a condition of this Letter of Credit that the Expiration Date will be automatically extended without amendment for one (1) year from the Expiration Date hereof, or any future Expiration Date, unless at least sixty (60) days prior to any Expiration Date we notify you by certified mail, return receipt requested, or overnight courier service with proof of delivery to _____ and concurrently notify YourPeople, Inc., d/b/a Zenefits, 40 E. Rio Salado Parkway, 9th Floor, Tempe, Arizona 85281, Attn: Emily Agin, in the same delivery method, that we elect not to extend the Expiration Date of this Letter of Credit.  Upon your receipt of such notification, you may draw against this Letter of Credit by presentation of this original Letter of Credit and the attached Exhibit B, with the blanks appropriately completed.

Demands presented by fax (to fax number _____ **[TO BE PROVIDED BY BANK]**) are acceptable; provided that if any such demand is presented by fax, the original Exhibit and Letter of Credit shall be simultaneously forwarded by overnight courier service to our office located at the address stated above; provided further that the failure of the courier service to timely deliver



shall not affect the efficacy of the demand.  Further, you shall give telephone notice of a drawing to the Bank, attention: _____ at _____, on the day of such demand, provided that your failure to provide such telephone notification shall not invalidate the demand.

Drawing(s) in compliance with all of the terms of this Letter of Credit, presented prior to 11:00 A.M., Pacific time, on a Business Day, shall be made to the account number or address designated by you of the amount specified, in immediately available funds, on the immediately following Business Day.

Drawing(s) in compliance with all of the terms of this Letter of Credit, presented on or after 11:00 A.M., Pacific time, on a Business Day, shall be made to the account number or address designated by you of the amount specified, in immediately available funds, on the second Business Day.

This Letter of Credit is transferable any number of times without charge to you.  Transfer must be requested in accordance with our transfer form, which is attached as Exhibit C, accompanied by the return of this original Letter of Credit and all amendments thereto for endorsement thereon by us to the transferee.  This Letter of Credit is transferable provided that such transfer would not violate any governmental rule, order or regulation applicable to us.

We hereby engage with you that documents (including fax documents) presented in compliance with the terms and conditions of this Letter of Credit will be duly honored if presented to our bank on or before the Expiration Date of this Letter of Credit, which is _____, 20__.

Multiple and partial drawings are permitted.

This Letter of Credit is subject to the International Standby Practices 1998, International Chamber of Commerce Publication No. 590.

**[Issuing Bank's name]**

By: _____
Name: _____
Title: _____

B-2



**Exhibit A to Exhibit B**

**SIGHT DRAFT**

Irrevocable Standby Letter of Credit No. _____

Date of This Draft: _____

To:

Name of Issuing Bank

Address

Re:      Irrevocable Standby Letter of Credit No. _____

To the order of _____

Pay _____ ($_____)

At Sight

The undersigned, a duly authorized official of YourPeople, Inc., a Delaware corporation (hereinafter referred to as "**Sublandlord**"), hereby certifies that Sublandlord is entitled to draw upon Irrevocable Standby Letter of Credit No. _____ in the amount of $_____ **[amount in words U.S. Dollars]** pursuant to that certain Sublease dated _____, 2016, by and between Sublandlord and _____, a _____ corporation, as Subtenant.

Payment of the amount demanded is to be made to the Beneficiary by wire transfer in immediately available funds in accordance with the following instructions:

**[Payment instructions to be inserted]**

_____

By:      _____
Name:  _____
Title:   _____

B-3

**Exhibit B to Exhibit B**

Irrevocable Standby Letter of Credit No. _____

Date: _____

To:

Name of Issuing Bank

Address

Ladies and Gentlemen:

Re:     Irrevocable Standby Letter of Credit No. _____

The undersigned, a duly authorized official of YourPeople, Inc., a Delaware corporation, (hereinafter referred to as "**Sublandlord**"), hereby certifies that Sublandlord is entitled to draw upon Irrevocable Standby Letter of Credit No. _____ in the amount of $_____ **[amount in words U.S. Dollars]** as we have been notified that the Letter of Credit will not be extended and _____ has not provided us with an acceptable substitute irrevocable standby letter of credit in accordance with the terms of that certain Sublease dated as of _____, _____ by and between Sublandlord and _____, as Subtenant.

Drawn under Irrevocable Standby Letter of Credit No. _____ issued by _____ **[name of Issuing Bank]**.

Payment of the amount demanded is to be made to the Beneficiary by wire transfer in immediately available funds in accordance with the following instructions:

**[Payment instructions to be inserted]**

**[Beneficiary's name]**

By:       _____
Name:   _____
Title:    _____

B-4



**Exhibit C to Exhibit B**

Irrevocable Standby Letter of Credit No. _____

Date: _____

To:

Name of Issuing Bank

Address

Ladies and Gentlemen:

Re:      Irrevocable Standby Letter of Credit No. _____

For value received, the undersigned Beneficiary hereby irrevocably transfers to:

_____
(Name of Transferee)

_____
(Address)

_____
(City, State, Zip Code)

All rights of the undersigned beneficiary to draw under the above Letter of Credit up to its available amount as shown above as of the date of this transfer.

By this transfer, all rights of the undersigned Beneficiary in such Letter of Credit are transferred to the Transferee and the Transferee shall have the sole rights as Beneficiary thereof, including sole rights relating to any amendments whether increases or extensions or other amendments and whether now existing or hereafter made.  All amendments are to be advised direct to the Transferee without necessity of any consent of or notice to the undersigned Beneficiary.

The original of such Letter of Credit is returned herewith, and we ask you to endorse the transfer on the reverse thereof, and forward it directly to the Transferee with your customary Notice of Transfer.

Very truly yours,

**[Beneficiary's name]**

By:       _____
Name:   _____
Title:    _____



The above signature with title as stated conforms to that on file with us and is authorized for the execution of said instruments.

**[Name of Authenticating Bank]**

By: _____

Name: _____

Title: _____

09600\004\7735681.V8



# EXHIBIT C

# Furniture Inventory

Zenefits Tempe - 7th Floor Inventory

## Workstations

| Tag | QTY | Description | Image | Notes |
|-----|-----|-------------|-------|-------|
| WS-01 | 230 | Steelcase Bivi Table For Two<br>48"W x 30"D<br>Top Finish: Laminate; Arctic White<br>Base Finish: Arctic White | | |
| ST-01 | 230 | Bisley Note Mobile Pedestal<br>11.82"W x 19.5"H x 22.26"D<br>Finish: White | | |

## Conference Tables

| Tag | QTY | Description | Image | Notes |
|-----|-----|-------------|-------|-------|
| TB-16A | 8 | Conference Table<br>HPL V-Leg<br>42x60<br>Finish: Silver base, white laminate top | | |
| TB-16B | 3 | Conference Table<br>HPL V-Leg<br>42x72<br>Finish: Silver base, white laminate top | | |
| TB-16C | 5 | Conference Table<br>HPL V-Leg<br>42x84<br>Finish: Silver base, white laminate top | | |
| TB-17B | 2 | Medium Conference Table<br>HPL Rectangular Table<br>42x96<br>Finish: Silver base, white laminate top | | |
| TB-17C | 1 | Boardroom Table<br>HPL Rectangular Table<br>204x60<br>Finish: Silver base, white laminate top | | |

## Chairs

| Tag | QTY | Description | Image | Notes |
|-----|-----|-------------|-------|-------|
| CH-01 | 230 | SitOnIt Wit Task Chair<br>Mid back & High back<br>Finish: Spice, Chai | | |
| CH-02 | 72 | Meeting Room Chair<br>Steelcase Cobi Chair<br>Finish: White frame, grey mesh | | |

C-1



| | | | | |
|---|---|---|---|---|
| CH-04 | 30 | Meeting Chair<br>Howe SixE 4-Leg Side Chair<br>20.5W x 21D x 31H<br>Finish: Dark grey |  | |
| CH-05 | 32 | Bar stool<br>Unknown |  | |
| CH-06 | 76 | Training Room Chair<br>Humanscale Cinto Chair<br>Glides, armless<br>Finish: Light grey |  | |
| CH-07 | 12 | Lounge Chair<br>Coalesse Joel Lounge Chair<br>30W x 29D x 27.5H<br>Finish: Blue, grey, purple |  | |
| CH-08 | 4 | Lounge Chair<br>Hightower Happy Highback Lounge Chair<br>30W x 29.5D x 39H<br>Finish: Light grey |  | |

## Sofas

| Tag | QTY | Description | Image | Notes |
|---|---|---|---|---|
| SO-01 | 1 | Sectional<br>BluDot Bonnie & Clyde Sectional<br>98 x 96<br>Finish: Condit Charcoal |  | |
| SO-03 | 5 | Sofa<br>Hightower Tombolo 3-Seater Sofa<br>83.5"W x 26D x 30.5H<br>Finish: Grey upholstery, blue leg detail |  | |
| SO-04 | 2 | Highback Sectional<br>Materia Monolite Highback<br>51.5W sections<br>Finish: Dark Grey |  | |

## Tables

| Tag | QTY | Description | Image | Notes |
|-----|-----|-------------|-------|-------|
| TB-01 | 11 | Laptop Table<br>WCI Move Table<br>13-15W x 18D x 25H<br>Finish: Hot rolled steel, white laminate |  | |
| TB-02 | 2 | Laptop Table<br>BluDot Swole Small Table<br>20W x 15D x 20H<br>Finish: Black |  | |
| TB-03A | 2 | Side Table<br>CB2 Silo Side Table<br>13.25W x 17.5H<br>Finish: Brushed iron, marble top |  | |
| TB-03B | 2 | Side Table<br>CB2 Silo Side Table<br>15.5W x 15.5H<br>Finish: Brushed iron, marble top |  | |
| TB-04 | 4 | Side Table<br>BluDot PI Side Table<br>18W x 20H<br>Finish: Walnut/black |  | |
| TB-06 | 7 | Meeting Table<br>Enwork Sensation Table<br>30dia<br>Finish: Grey base, white lamiante top |  | |
| TB-10 | 2 | Café Table<br>Enwork Sensation Table<br>36W x 36W<br>Finish: Grey base, white lamiante top |  | |
| TB-11 | 4 | Standing Height Table<br>Turnstone Campfire Big Table<br>96"W x 48"D x 40"H<br>With power, plug in<br>Finish: Wood laminate |  | |
| TB-12 | 38 | Training Room Table<br>Enwork Impression Flip-Top w/ casters<br>Finish: Grey base, white laminate top |  | |

C-3

## Ottomans

| Tag | QTY | Description | Image | Notes |
|---|---|---|---|---|
| OT-01 | 12 | Small Ottoman<br>Arper Pix<br>26.5W x 17H |  | |
| OT-02 | 9 | Medium Ottoman<br>Arper Pix<br>34.25W x 17H |  | |

## Benches

| Tag | QTY | Description | Image | Notes |
|---|---|---|---|---|
| BN-01 | 2 | Modular Bench<br>Hightower Runway<br>Finish: Grey/turquoise |  | |
| BN 02 | 1 | Small Bench<br>BluDot Bank Bench<br>48"W x 18"D<br>Finish: Lava, metal |  | |

## Other

| Tag | QTY | Description | Image | Notes |
|---|---|---|---|---|
| CR-01 | 3 | Credenza<br>Unknown |  | |
| LN-01 | 1 | Lectern<br>Unknown |  | |

C-4

| Count | Description | Manufacturer | Model # |
|-------|-------------|--------------|---------|
| Seven (7) | 90" Display | Sharp | LC-90LE656U |
| | Audio Amp | Extron | 60-845-01 |
| | Speakers | Tannoy | 8001 4240 |
| | | | |
| Two (2) | 75" Display | Samsung | UN75J6300AF |
| | | | |
| Two (2) | 4 post racks | | |
| Four (4) | 2 post racks | | |
| Four (4) | Wire managers | | |
| One (1) | Ladder racking system | | |
| One (1) | UPS | | |
| | | | |
| | | | |
| | | | |
| | | | |

# EXHIBIT B

## AMERIFIRST FINANCIAL - FINANCIAL STATEMENT

**AMERIFIRST FINANCIAL, INC.**
**CONSOLIDATED BALANCE SHEETS**

|  | December 31, | |
| --- | --- | --- |
| **ASSETS** | **2015** | **2014** |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 3,150,305 | $ 5,423,483 |
| Restricted cash | 542,075 | 580,932 |
| Escrow cash | 525,184 | 438,504 |
| Mortgage loans held for sale, at fair value | 100,442,551 | 79,033,153 |
| Mortgage loans held for investment, net | 4,406,239 | 1,607,387 |
| Accounts receivable | 231,642 | 444,547 |
| Derivative assets | 1,553,751 | 1,103,032 |
| Prepaid expenses and other current assets | 1,380,185 | 145,063 |
| Total current assets | 112,231,932 | 88,776,101 |
| | | |
| **OTHER ASSETS** | | |
| Property and equipment, net | 1,404,219 | 1,369,825 |
| Mortgage servicing rights, net | 179,774 | 10,945 |
| Deposits | 276,560 | 233,347 |
| Total other assets | 1,860,553 | 1,614,117 |
| | | |
| **TOTAL ASSETS** | $ 114,092,485 | $ 90,390,218 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Accounts payable and accrued expenses | $ 4,118,191 | $ 4,713,352 |
| Customer deposits and loan escrows | 632,838 | 499,254 |
| Loan indemnification reserve | 886,204 | 704,307 |
| Warehouse lines of credit | 96,037,815 | 74,947,618 |
| Operating line of credit | - | 500,000 |
| Derivative liabilities | 36,330 | 175,560 |
| Notes payable | 590,000 | - |
| Capital lease obligations, current portion | 97,168 | 77,766 |
| Total current liabilities | 102,398,546 | 81,617,857 |
| Capital lease obligations, net of current portion | 68,480 | 42,939 |
| Total liabilities | 102,467,026 | 81,660,796 |
| | | |
| **COMMITMENTS AND CONTINGENCIES (Note M)** | | |
| | | |
| **STOCKHOLDERS' EQUITY** | | |
| Common stock, $0.004 par value; 250,000 shares authorized, issued and outstanding | 1,000 | 1,000 |
| Retained earnings | 11,624,459 | 8,728,422 |
| Total stockholders' equity | 11,625,459 | 8,729,422 |
| | | |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 114,092,485 | $ 90,390,218 |

The accompanying notes are an integral part of these consolidated financial statements.

**AMERIFIRST FINANCIAL, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

|  | Years Ended December 31, | | | |
|---|---|---|---|---|
|  | **2015** | | **2014** | |
| **REVENUE** | | | | |
| Gain on sale of mortgage loans held for sale, net of direct | | | | |
| costs of $12,047,627 and $9,993,051, respectively | $ | 55,818,566 | $ | 35,561,338 |
| Loan origination fees | | 16,994,251 | | 12,300,459 |
| Interest income | | 3,698,535 | | 2,771,332 |
| Interest expense | | (3,071,672) | | (2,362,779) |
| Loan servicing fees, net of direct costs of $32,350 and | | | | |
| $5,863, respectively | | 186,441 | | 5,343 |
| Other income | | 39,274 | | 36,133 |
| Total revenue | | 73,665,395 | | 48,311,826 |
| | | | | |
| **EXPENSES** | | | | |
| Salaries, commissions and benefits | | 55,066,200 | | 37,103,090 |
| Occupancy, equipment and communication | | 4,451,483 | | 4,450,897 |
| General and administrative | | 7,071,266 | | 4,901,406 |
| Provision for loan losses | | 841,866 | | 588,993 |
| Depreciation and amortization | | 457,759 | | 383,841 |
| Amortization of mortgage servicing rights | | 18,175 | | 245 |
| Valuation adjustment of mortgage servicing rights | | 12,647 | | - |
| Loss on sale of mortgage loans held for investment | | 37,711 | | - |
| Total expenses | | 67,957,107 | | 47,428,472 |
| | | | | |
| **NET INCOME** | $ | 5,708,288 | $ | 883,354 |

# EXHIBIT C

1    Robert A. Henry (#015104)
2    Kelly A. Kszywienski (#025578)
     SNELL & WILMER L.L.P.
3    One Arizona Center
     400 East Van Buren, Suite 1900
     Phoenix, Arizona  85004-2202
4    Telephone:  (602) 382-6000
     Facsimile:   (602) 382-6070
5    E-Mail:      bhenry@swlaw.com
                  kkszywienski@swlaw.com
6    *Attorneys for YourPeople, Inc. d/b/a Zenefits FTW*
     *Insurance Services*
7

8              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

9                 **IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| 10  AmeriFirst Financial, Inc., | No. CV2016-014888 |
| 11           Plaintiff, | **NOTICE OF FILING REMOVAL** |
| 12  v. | (Assigned to the Honorable Dawn Bergin) |
| 13  PKY Fund II Phoenix III, LLC; YourPeople, Inc. d/b/a Zenefits FTW | **(Return Hearing Scheduled for Sept. 21, 2016 at 1:30 p.m. Before the Honorable** |
| 14  Insurance Services, | **Karen Mullins)** |
| 15           Defendants. | |

16

17         **PLEASE TAKE NOTICE** that on September 20, 2016, Defendant YourPeople,

18   Inc. d/b/a Zenefits FTW Insurance Services ("Zenefits") is filing a Notice of Removal

19   with the U.S. District Court for the District of Arizona, Phoenix Division under 28 U.S.C.

20   § 1332(a) (diversity jurisdiction).

21         Pursuant to 28 U.S.C. § 1446(d), the filing of this Notice of Removal with the

22   Clerk of the Maricopa County Superior Court, effects removal of this action from the state

23   court to the U.S. District Court and it is hereby requested that "the State court shall

24   proceed no further unless and until the case is remanded."

25         A copy of the Notice of Removal (without exhibits) to be filed this date in the

26   District of Arizona is attached hereto as Exhibit 1 and incorporated by reference.

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

1    DATED this 20th day of September, 2016.

2                                                    SNELL & WILMER L.L.P.

3

4                                         By: /s/ Kelly A. Kszywienski
                                              Robert A. Henry
5                                             Kelly A. Kszywienski
                                              One Arizona Center
6                                             400 East Van Buren, Suite 1900
                                              Phoenix, Arizona  85004-2202
7                                             *Attorneys for YourPeople, Inc. d/b/a*
                                              *Zenefits FTW Insurance Services*

8

9    **ORIGINAL** of the foregoing **E-FILED**
     this 20th day of September, 2016.

10

11   **COPY** of the foregoing served via **AZTurboCourt**
     this 20th day of September, 2016, to:

12   Rodolfo Parga, Jr.
     Andrea G. Lovell
13   RYLEY CARLOCK & APPLEWHITE
     One North Central Avenue, Suite 1200
14   Phoenix, AZ 85004-4417
     rparga@rcalaw.com
15   *Attorneys for AmeriFirst Financial, Inc.*

16   Glenn Hotchkiss
     BUCHALTER NEMER
17   16435 North Scottsdale Road, Suite 440
     Scottsdale, AZ 85254-1754
18   ghotchkiss@buchalter.com
     *Attorneys for PKY Fund II Phoenix III, LLC*

19

20   */s/ Pati Williams*

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000